[No. B229507. Second Dist., Div. Four. Aug. 30, 2011.]

In re HUNTER W., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
IVY B. et al., Defendants and Appellants.

## COUNSEL

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant Ivy B.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant Raymond W.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, P. J.**—Raymond W. (father) and Ivy B. (mother) appeal from orders denying their Welfare & Institutions Code section 388[1] change of circumstance petitions and terminating their parental rights as to their son, Hunter W. The juvenile court held a hearing on appellants' section 388 petitions. Appellants checked in at the morning calendar call, but were not present in court at the start of the hearing hours later. Appellants' respective counsel requested a brief two-hour delay to locate them. The court denied the request and proceeded with the section 388 hearing and then the section 366.26 permanency hearing. Appellants argue the court violated their right to due process by denying the requests and by proceeding with the hearing in their absence.[2] Under the circumstances presented, we conclude the court abused its discretion in denying the requests to delay the hearing, and reverse on that ground. Mother also argues that the court erred in finding that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply in this case. We do not agree, and affirm on that issue.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Appellants also argue that the court abused its discretion in denying their section 388 petitions and that the court's decision to terminate their parental rights was not supported by substantial evidence. As we rest on the due process issue, we do not reach these arguments.

## FACTUAL AND PROCEDURAL SUMMARY

Appellants are the parents of Hunter W. (born June 2009). In 2004, two of mother's children were killed in a car accident, in which mother fell asleep while driving. In 2006, mother's six-month-old baby fell off the bed and was wedged between the bed and dresser, resulting in the baby's death. Parents were convicted of child cruelty. On July 1, 2009, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition alleging that Hunter W.'s physical health and safety were at risk due to the history of child deaths while in mother's custody. It also was alleged that father had a history of substance abuse and criminal convictions, endangering Hunter's physical and emotional health and safety. Following his birth, Hunter was held in the hospital and later placed in a foster home.

On July 1, 2009, mother signed a Judicial Council ICWA-030 form (ICWA-030 form) indicating that she may have Indian ancestry through her father and her paternal grandmother. Father declared that he had no Indian ancestry to his knowledge. The juvenile court held a detention hearing on July 2, 2009, first addressing mother's claim to Indian heritage. The court found that based on the information mother provided it "does not have reason to know the child is an Indian child as defined under ICWA and does not order notice to any tribe or the [Bureau of Indian Affairs]." The court then found a "prima facie case for detaining Hunter and showing that he is a person described by [section] 300 . . . ."

The court held a jurisdictional hearing on October 7, 2009. Mother waived her trial rights and pled no contest to the petition. The court sustained the petition in part as to mother. Father was not present and the court held the counts regarding him in abeyance, and continued the matter to October 14, 2009. On October 14, 2009, the court sustained the petition as to father, declared Hunter a dependent of the court and placed him with his paternal great aunt, Nikki C. The court denied reunification services to both parents pursuant to section 361.5, subdivision (b)(4),[3] and ordered monitored visits. A section 366.26 permanency hearing was set for February 10, 2010.

On December 17, 2009, DCFS filed a section 387 petition, alleging that Nikki C. requested Hunter be removed from her home and care and that she had violated a court order by allowing mother to stay with her and have unmonitored access to Hunter. DCFS recommended that Hunter be detained. Neither parent attended the section 387 petition hearing on December 17. The

---

[3] Section 361.5, subdivision (b) provides: "Reunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (4) That the parent or guardian of the child has caused the death of another child through abuse or neglect."

court dismissed the petition and ordered Hunter be suitably placed. It also ordered DCFS to look into possible relatives for placement and present its findings in the February 10, 2010 permanency report.

In February 2010, DCFS noted that all of the relatives mother listed as possible placements for Hunter resided out of state and that "an [Interstate Compact on the Placement of Children] request is needed to open a placement or adoption home study on any of these relatives."[4] The court held the section 366.26 permanency hearing on February 10, 2010. Neither parent appeared, but the court found they received proper notice of the hearing. The court ordered an Interstate Compact on the Placement of Children assessment for relatives in Georgia and Washington, and continued the permanency hearing to August 17, 2010. DCFS filed a last minute memorandum on August 17, recommending that Hunter remain with his current foster parents and not be placed with out-of-state relatives. The court held the continued permanency hearing on the same day. Mother was present and father was not, but he was represented by counsel. Both parents set the matter for contest, in light of DCFS's last-minute memorandum. The matter was continued to September 24, 2010.

On September 22, 2010, mother filed a section 388 change of circumstances petition, asking the court to order reunification services. Mother stated that she had completed or was currently participating in various parenting counseling programs, and attached various exhibits documenting her participation. On September 24, the court trailed the permanency hearing in light of mother's section 388 petition. On October 4, the court set mother's section 388 hearing for November 18, 2010 and trailed the permanency hearing.

Father filed a section 388 petition on November 18, 2010, asking the court to take the permanency hearing off calendar, provide him with reunification services, issue a home of parent order and order unmonitored visits. Father stated that he "is enrolled and in the final phase of an intensive program through the House of Hope," which includes individual counseling for anger management, domestic violence, and parenting. Attached to the petition was a letter from House of Hope director Larry Harris, confirming father's participation.

On November 18, the court continued mother's section 388 petition hearing and the permanency hearing to November 23, 2010. Both parents appeared at the November 23 hearing. Mother began presenting her evidence for her section 388 petition, beginning with cross-examination of social

---

[4] Family Code section 7900 et seq., known as the Interstate Compact on Placement of Children, prescribes the procedures that must be followed before a dependent child is placed out of state.

worker Michelle Ramirez, who prepared a DCFS report earlier in the month recommending the court deny mother's petition. Father's counsel then examined Ramirez in respect to father's petition. Father's counsel completed her examination of Ramirez, and the court continued the matter to December 6, 2010, for the testimony of mother, father, and Harris.

Mother and father checked in at calendar call at 8:30 a.m. on December 6. The court reconvened at 10:20 a.m., noting that while both parents had checked in at calendar call, neither was present or responding to the pages to report back to court. Father's counsel informed the court that father went to his treatment program to obtain a signed certificate. He stated: "[Father] said it would be ready at 10:00 a.m. and its 10:20. I'm assuming that's where he is. It's in L.A. And then he is coming back. So I would ask for a brief continuance. I asked for him to get the letter because Mr. Harris, the program director, I have not been able to be in contact with him and the letter that he produced was not signed or even validated." She continued: "And in fairness, Your Honor, there was an officer here on another case, and I thought he was going to be testifying this morning. So that's why I told him to go now so that he would be back by 1:30."

The court responded that it had five trials on calendar that day and that even if father returned by 1:30 p.m., the letter would be inadmissible hearsay. Counsel answered that she had subpoenaed Harris for the November 23 hearing but he did not appear and she was seeking a body attachment. The court then asked attorneys to proceed with their next witnesses. Father's counsel stated that father and Harris were her only witnesses. Mother's counsel stated her only witness was mother, and asked for a brief continuance to find her.

The court proceeded with the section 388 hearing without expressly ruling on counsel's requests. Following argument by all counsel, the court denied mother's section 388 petition and added: "Just so the record is clear, the request for a continuance was also denied [Father's] request for a continuance was also denied as well. This was in progress and set at 8:30 this morning. We've been ongoing for about a half hour and mother still has not appeared." The court recounted the matter's procedural history, noting that the permanency hearing was set 10 months earlier and was continued several times. The court found that it is not "in this child's best interest to put this matter over any further. The reality is we've gone ten months around this, and it seems to me frankly that at this point the parents are playing the system and trying to delay it. This is a young child so deserving of permanence the court cannot find under [section] 352 that it's in his best interest to continue this matter any further while the parents are running around." The court noted it had 27 matters on calendar that day, five of them being trials, and concluded that there was no good cause for the continuance.

Father's counsel responded: "I don't see that a few hours would harm the child. And I do see that going forward without all the evidence in front of the court is extremely detrimental to the child." The court stated: "I find it distressing to me that there seems to be the setup of an ineffective assistance of counsel here. I find that depressing. . . . But at this point the court has given ample continuances for the evidence to be presented to the court."

The court then proceeded with the permanency hearing, finding by clear and convincing evidence that Hunter is adoptable, and that no exceptions applied to either parent. Mother and father's parental rights were terminated and adoption was selected as Hunter's permanent plan. Mother and father filed timely appeals.

## DISCUSSION

## I

As a preliminary matter, respondent argues that father did not reach presumed father status and therefore does not have standing to challenge the court's orders denying his section 388 petition and terminating his parental rights. We do not agree.

■ California law distinguishes " 'alleged,' " " 'biological,' " and " 'presumed' " fathers. (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018 [72 Cal.Rptr.3d 27].) " 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father.' " (*Ibid.*) " 'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . .' " (*Ibid.*) "Presumed father status ranks highest" (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [116 Cal.Rptr.2d 123]), and "[o]nly presumed fathers are entitled to reunification services and to possible custody of the child" (*In re E.O.* (2010) 182 Cal.App.4th 722, 726 [107 Cal.Rptr.3d 1]).

"[P]resumed father status is based on the familial relationship between the man and child, rather than any biological connection." (*In re J.L., supra*, 159 Cal.App.4th at p. 1018.) Family Code section 7611 lists several rebuttable presumptions under which a man may qualify as a presumed father. (See *In re M.C.* (2011) 195 Cal.App.4th 197, 212 [123 Cal.Rptr.3d 856] [" 'The statutory purpose [of Family Code section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' "].) A man may also, "under narrow circumstances, assert constitutional paternity rights, even though he

does not qualify under a statutory presumption under section 7611. [Citations.] Such a quasi-presumed, or [*Kelsey S.*[5]] father as they are most commonly known, is an unwed biological father who comes forward at the first opportunity to assert his parental rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under [Family Code] section 7611 by the unilateral conduct of the child's mother or a third party's interference." (*Id.* at pp. 212–213.)

 Although *Kelsey S.* was not a dependency case, courts have extended its holding to dependency proceedings granting *Kelsey S.* fathers constitutional protections in those proceedings. (*In re M.C., supra,* 195 Cal.App.4th at p. 219; see also *In re Jason J.* (2009) 175 Cal.App.4th 922, 932–934 [96 Cal.Rptr.3d 625]; *In re Nicholas H.* (2002) 28 Cal.4th 56, 67 [120 Cal.Rptr.2d 146, 46 P.3d 932].) Courts have upheld a *Kelsey S.* father's right to seek reunification services. (See *In re Andrew L.* (2004) 122 Cal.App.4th 178, 191–195 [18 Cal.Rptr.3d 591] [trial court did not abuse its discretion in granting a § 388 petition and ordering reunification services for a *Kelsey S.* father]; see also *In re Julia U.* (1998) 64 Cal.App.4th 532, 543 [74 Cal.Rptr.2d 920] [trial court erred in terminating reunification services before father had opportunity to prove he was a *Kelsey S.* father].) It follows that a *Kelsey S.* father has standing to challenge an order denying a section 388 petition seeking reunification services.

In determining whether a man is a *Kelsey S.* father with parental rights, the court considers the man's "conduct before and after the child's birth, including whether he publicly acknowledged paternity, paid pregnancy and birth expenses commensurate with his ability to do so, and promptly took legal action to obtain custody of the child. [Citation.] He must demonstrate a full commitment to his parental responsibilities within a short time after he learned that the biological mother was pregnant with his child. [Citation.] He must also demonstrate a willingness to assume full custody. [Citation.]" (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 [25 Cal.Rptr.3d 774].)

Here, both mother and father indicated he was Hunter's biological father. Days after Hunter's birth, father completed a statement of parentage form, requesting presumed father status. Father stated that he told family and friends Hunter was his biological son, supported mother financially and emotionally during her pregnancy and following Hunter's birth, purchased clothes and supplies, and was committed to parenting his son. At the July 2, 2009 detention hearing the court stated: "The father did not sign the paternity declarations at the hospital. Based on the [statement of parentage form], however, it appears he's taken all steps otherwise necessary to be a *Kelsey S.*

---

[5] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*).

father. . . . The court's making a finding he's a *Kesley S.* father. He's worked toward presumed father status."

Respondent does not challenge the court's finding, but rather argues that father's *Kelsey S.* status provides him with no more rights in a dependency proceeding than a biological father. As discussed above, the law does not support this assertion. (See *In re J.L., supra,* 159 Cal.App.4th at p. 1023 ["Although section 7611 makes no provision for a *Kelsey S.* father in its list of presumptions, a father asserting valid *Kelsey S.* rights may effectively qualify for presumed father status as the result of his constitutional right to parent, which overrides any contrary statutory direction."].) Thus, father has standing to challenge the orders denying his section 388 petition and terminating his parental rights.

## II

Mother and father argue the court violated their due process rights by denying their attorneys' requests for a brief delay (which father's attorney inaccurately characterized as a "continuance") to locate them and, instead, proceeded with the section 388 hearing in their absence. We need not address whether the proceedings violated the due process rights of either appellant since we decide that it was an abuse of discretion not to hold the case to the afternoon calendar.

■ " 'Since the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him [or her] adequate notice and an opportunity to be heard. [Citations.]' " (*Adoption of B.C.* (2011) 195 Cal.App.4th 913, 924–925 [125 Cal.Rptr.3d 727], quoting *In re B. G.* (1974) 11 Cal.3d 679, 688–689 [114 Cal.Rptr. 444, 523 P.2d 244].)

■ Section 388 permits "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court" to petition "for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court" on grounds of "change of circumstance or new evidence." When a parent makes a prima facie showing of changed circumstances under section 388, he or she has a due process right to a full and fair hearing on the merits. (*In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1800 [53 Cal.Rptr.2d 294].) "Due process generally requires . . . that parents be given the right to present evidence, and to cross-examine adversarial witnesses, such as the caseworker and persons whose hearsay statements are contained in the reports, 'i.e., the right to be heard in a meaningful manner.' " (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 915 [76 Cal.Rptr.3d

361].) However, a parent's right to due process is "limited by the need to balance the 'interest in regaining custody of the minors against the state's desire to conclude dependency matters expeditiously . . . .' " (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176 [108 Cal.Rptr.2d 493].) Accordingly, in dependency proceedings, "[t]he court must control all proceedings with a view to quickly and effectively ascertain[] the jurisdictional facts and all information relevant to the present condition and welfare of the child." (Cal. Rules of Court, rule 5.534(a).)

■ Here, the court's decision to proceed with the section 388 hearing in appellants' absence resulted in appellants being unable to present their positions in a meaningful manner. Although appellants introduced documentary evidence in support of their respective petitions, they should have been afforded the opportunity to testify as to how their circumstances had changed and why they were entitled to reunification services. This is especially so when no other witnesses were testifying on behalf of mother, and father's other lone witness, Harris, had yet to appear at any hearing. Moreover, mother was unable to respond to social worker Ramirez, who testified to her interactions with mother and why she believed mother's section 388 petition should be denied.

While the juvenile court exercises broad control over dependency proceedings (*In re Kelly D.* (2000) 82 Cal.App.4th 433, 439 [98 Cal.Rptr.2d 188]), here, the court's reliance on section 352 in denying counsel's requests was inappropriate. Section 352, subdivision (a) provides: "Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. . . . [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." Although counsel for appellants and the court all referred to the requests as requests for a continuance, we find that counsel were not requesting a continuance, as envisioned in section 352, but rather, were simply asking the court to hold the matter for a short time so that mother could be located and father could be notified to return to court. Delaying the matter for some time would not have pushed the proceeding "beyond the time limit within which the hearing is required to be held . . . ." (§ 352, subd. (a).) The court gave no explanation as to why the matter had to proceed at that particular time, besides referencing its calendar. In particular, the court did not indicate why it could not proceed on other matters on its calendar awaiting hearing that day. Nothing suggests that other proceedings would have been disrupted by a short hold. Hunter's counsel and counsel for DCFS did not call any witnesses, and no other witnesses were present waiting to testify. In the absence of appellants, both counsel were forced to proceed

with argument. Nor does the record support the court's assertion that the parents were simply "playing the system" and trying to delay the proceeding. The record demonstrates that mother and father were present at the November 23 hearing and would have testified on that date had there been time. At the end of social worker Ramirez's testimony on November 23, the court stated: "And as to the 388, my understanding is we have mother, father and Mr. Harris . . . . We are going to continue this for them, because mother's testimony is apparently going to be lengthy and we don't have time to do it today."

Even if section 352 applied, nothing supports the court's conclusion that a two-hour delay would be contrary to Hunter's interest. Section 352, subdivision (a) in pertinent part provides: "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." Here, the court held that a delay would not be in the best interest of a child "so deserving of permanence." The court provided no reason why a short two-hour delay conflicted with the "need to provide children with stable environments" (§ 352, subd. (a)) or jeopardized Hunter's chances for a permanent placement. Therefore, we reverse the court's order denying mother's and father's section 388 petitions.

■ The court's order terminating appellants' parental rights must also be reversed. "[A] fair hearing on the section 388 petition [is] a procedural predicate to proceeding to the section 366.26 hearing and disposition." (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1416 [5 Cal.Rptr.2d 148]; see also *In re Hashem H., supra*, 45 Cal.App.4th at p. 1801 ["The court must first afford appellant a fair hearing on her alleged change of circumstances before proceeding to the section 366.26 hearing and disposition."].) Thus, "because we reverse the order denying [appellants'] petition[s] for failure to [provide them with an adequate opportunity to present their case], we must also reverse the order under section 366.26 terminating parental rights and selecting adoption as the permanent plan." (*In re Lesly G., supra*, 162 Cal.App.4th at p. 916.)

## III

Mother argues the court erred by finding that the ICWA did not apply in this case and by not requiring DCFS to make an adequate inquiry into Hunter's possible Indian ancestry.[6] We do not agree.

---

[6] Mother incorporates father's ICWA argument, pursuant to California Rules of Court, rule 8.200(a)(5).

"Congress enacted ICWA in 1978 to protect Indian children and their tribes from the erosion of tribal ties and cultural heritage and to preserve future Indian generations. [Citations.] Because ' "the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents" ' [citation], a tribe has the right to intervene in a state court dependency proceeding at any time [citation]. This significant right, however, is meaningless unless the tribe is notified of the proceedings. [Citation.] 'Notice ensures the tribe will be afforded the opportunity to assert its rights under the [ICWA] irrespective of the position of the parents, Indian custodian or state agencies.' " (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 848 [131 Cal.Rptr.2d 256].)

ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).)

In 2007, the state Legislature enacted section 224 in accordance with ICWA. Section 224.2, subdivision (a) similarly provides: "If the court, a social worker, or probation officer knows or has reason to know that an Indian child is involved, any notice sent in an Indian child custody proceeding under this code shall be sent to the minor's parents or legal guardian, Indian custodian, if any, and the minor's tribe . . . ." "The circumstances that may provide reason to know a child is an Indian child include . . . the following: [¶] (1) A person having an interest in the child, including the child . . . or a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (§ 224.3, subd. (b)(1).)

"The determination of a child's Indian status is up to the tribe; therefore, the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement." (*In re Nikki R., supra*, 106 Cal.App.4th at p. 848.) Section 224.3, subdivision (a) places an "affirmative and continuing duty" on the court and county welfare department in a dependency proceeding to "inquire whether a child . . . is or may be an Indian child . . . ." Thus, if the court or social worker knows or has reason to know that an Indian child is involved, "the social worker . . . is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members . . . and contacting the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility." (§ 224.3, subd. (c).)

Reversal on ICWA grounds is not warranted in this case. When it is shown that the court or department knew or had reason to know the child was an Indian child but failed to make an inquiry, we remand with instructions to ensure compliance with ICWA; however, in doing so, we do not reverse the jurisdictional or dispositional orders where there is not yet a sufficient showing that the child is, in fact, an Indian child within the meaning of ICWA. (*In re Damian C.* (2009) 178 Cal.App.4th 192, 199–200 [100 Cal.Rptr.3d 110].) We review a court's ICWA findings for substantial evidence. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 178–179 [6 Cal.Rptr.3d 205].)

On July 1, 2009, mother signed an ICWA-030 form indicating that she may have Indian ancestry through her father, William B., and her paternal grandmother, Annie Mae B. Mother indicated that her paternal grandmother died in Chicago, Illinois, and that her father was born, and currently resides, in Chicago. She did not provide any contact information for her father. On July 2, 2009, the court addressed mother's claim of Indian heritage. Mother stated that she was not registered with any tribe. She last had contact with her father "probably a year ago" and was not sure that he was her biological father. She did not know his address, phone number, or date of birth.

The court found that it had no reason to know Hunter was an Indian child. It stated: "First of all, ICWA heritage only follows the biological parents. And the mother in this case is not sure that this person who claims possible American Indian heritage is biologically related to her." The court added: "Secondly, . . . no one, to her knowledge, is eligible for membership or [is] a member of any tribe. She doesn't know the tribe." The court held that it "does not believe that family lore, pursuant to case law, is reason to know a child would fall under [ICWA]," and no notice need be given to any tribe or to the Bureau of Indian Affairs. The court ordered the parents to "keep [DCFS], their attorney, and the court aware of any new information relating to possible ICWA status."

Mother argues that she provided "information suggesting . . . the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (§ 224.3, subd. (b)(1).) We do not agree. *In re J.D.* (2010) 189 Cal.App.4th 118 [116 Cal.Rptr.3d 545], is instructive. In that case, the minor's paternal grandmother, Claudia C., informed a social worker that *her* maternal grandmother once told Claudia that she, Claudia, had Indian ancestry. Claudia did not know whether it was from her maternal grandmother or grandfather and could not provide the name of the tribe. She did not have any living relatives who could provide more information. (*Id.* at p. 123.) Claudia's relatives, who lived in Arkansas, did not live on a reservation or attend an Indian school. The trial court found it had no reason to know that

the minor would fall under ICWA. (*In re J.D.*, at p. 123.) The appellate court affirmed the decision, finding Claudia's information "too vague, attenuated and speculative" to give the dependency court any reason to believe the minor may be an Indian child. (*Id.* at p. 125.) Similarly, the court in *In re O.K.* (2003) 106 Cal.App.4th 152 [130 Cal.Rptr.2d 276], cited by *In re J.D., supra,* 189 Cal.App.4th 118, found ICWA did not apply when the minor's grandmother told the court that the minor " 'may have Indian in him,' " but could not identify a particular Indian tribe or nation. (*In re O.K., supra,* 106 Cal.App.4th at p. 155.)

Here, mother indicated she may have Indian heritage through her father and deceased paternal grandmother. She could not identify the particular tribe or nation and did not know of any relative who was a member of a tribe. She did not provide contact information for her father and did not mention any other relative who could reveal more information. Mother argues that DCFS could have questioned her remaining relatives for more information, but this does not address the issue of whether the information *mother* provided was sufficient to trigger this duty. Mother offers no authority in support of her position that the court erred in finding her information too speculative to trigger ICWA. Specifically, she cites no authority in which the court found sufficient information to trigger ICWA when the parent could not even identify the tribe the family may have had connections to.

 Mother also argues that the court erred in holding that Indian heritage, for the purposes of ICWA, can only be transferred through biological relatives. She cites *In re B.R.* (2009) 176 Cal.App.4th 773 [97 Cal.Rptr.3d 890], in support of her position. In that case, the father's adoptive father was one-fourth Apache Indian, but the juvenile court held that ICWA did not apply. (176 Cal.App.4th at p. 778.) On appeal, the court held that "a determination of the minors' membership status in a tribe is not for the state court or a social worker to make as a matter of law under . . . ICWA." (*Id.* at p. 781.) Citing guidelines promulgated by the Bureau of Indian Affairs, the court stated: "[T]he Guidelines and accompanying commentary emphasize that when it comes to the determination of a child's Indian tribe membership status, it is for the tribe itself to make that determination . . . ." (*Id.* at p. 782.) The court held that the definition of Indian child under ICWA does not automatically exclude the grandchildren by adoption of an ancestor with Indian blood. It noted: "ICWA focuses on 'membership' rather than racial origins. It protects children who are 'members of or eligible for membership in' federally recognized Indian tribes. . . . [¶] Tribal membership is treated under . . . ICWA as a matter of political affiliation rather than racial origin . . . ." (176 Cal.App.4th at p. 783.) California's provisions on Indian children incorporated the same definition of membership. (*Ibid.*) Thus, the juvenile court erred in not requiring notice to the Apache tribes. (*Ibid.*)

Similarly here, the court erred by stating that ICWA did not apply to this case because Hunter may not be biologically related to his maternal grandfather of Indian ancestry. However, as we have discussed, the court also concluded mother's claim of Indian heritage through her father was too speculative to begin with, ruling that "[t]he court does not believe that family lore . . . is reason to know a child would fall under [ICWA]." We conclude that this is an independent and valid reason for the court to find that ICWA did not apply.

## DISPOSITION

We reverse the orders denying appellants' section 388 petitions and terminating their parental rights and remand with instructions to conduct another petition hearing. The ruling finding ICWA did not apply is affirmed.

Willhite, J., and Suzukawa, J., concurred.