Filed 10/15/14  In re Bella C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re BELLA C., a Person Coming Under the Juvenile Court Law. | B255287 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent.<br><br>      v.<br><br>DAVID C.,<br><br>      Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK93494) |

APPEAL from an order of the Superior Court of Los Angeles County.  Carlos E. Vazquez, Judge.  Affirmed.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel for Plaintiff and Respondent.

David C. (father) appeals from the juvenile court's February 27, 2014 order terminating his parental rights pursuant to Welfare & Institutions Code section 366.26[1] over his daughter Bella (born September 2008). Father contends that the juvenile court abused its discretion in denying his continuance of the contested section 366.26 hearing where he mistakenly failed to appear, and consequently was unable to provide critical testimony about his relationship with Bella. Father also argues that the juvenile court erred in refusing to comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) because the Department of Children and Family Services (DCFS) neglected its mandatory duty to collect further information which resulted in only one out of two possible "Crow" tribes being given notice.

We find no error and affirm the order terminating father's parental rights.

## FACTUAL AND PROCEEDURAL BACKGROUND

### Family information

Bella's mother, Rebecca H. (mother), is deceased. Mother's parents, Pamela and Larry H. (maternal grandparents) have cared for mother's 18-year-old daughter, Elizabeth, and 13-year-old daughter, Willow, since those children were born. Father is the presumed father of mother's youngest daughter, Bella. Prior to mother's death, Bella lived with mother and father, who were regularly assisted by maternal grandmother and maternal grandfather. Bella was placed with Heidi T. (maternal aunt), while the investigation into mother's death continued.[2]

### Prior history with DCFS

On May 1, 2006, DCFS received a referral that mother was a long-time heroin user who came to maternal grandmother's home high, attempting to take the children. DCFS found that mother made an appropriate plan to have maternal grandparents care for the children, and the referral was deemed unfounded. On April 17, 2008, DCFS received

_____

[1] All further statutory references are to the Welfare & Institutions Code unless otherwise noted.

[2] Father and DCFS are the only parties to this appeal.

2

a referral that father punched child Willow in the face, knocking out her teeth. No evidence indicated that the child endured any trauma to her face or mouth; hence DCFS determined the allegations of physical abuse were unfounded. On December 1, 2010, DCFS received a report of severe neglect alleging that father drove Bella while under the influence of alcohol. The investigation was found to be untrue, and the referral was closed.

**Section 300 petition and detention**

DCFS received the current referral from the Child Abuse Hotline on May 3, 2012, following the death of mother. The caller reported that mother, who had used heroin for about the preceding 10 years, died in Pomona Valley Hospital just after a radiologist found a syringe in her hand. The caller stated that father, who had a history of alcohol abuse, had been arrested the day before by the Pomona Police Department, but did not know the reason for the arrest nor when father would be released from jail. The caller also noted that the children were safe and staying at maternal grandparents' home.

On April 28, 2012, father had informed maternal grandmother that he was taking mother to the hospital to have an abscess removed. Maternal grandmother cared for Bella while mother was reportedly in the hospital. Later that day maternal grandmother gave father $40 to pay for mother's medication at his request. On May 4, 2012, father called again asking for more money for medicine after having to again take mother to the hospital. Wary that they were using the money for illicit drugs, maternal grandfather told father to bring him the prescriptions so that he could fill them himself.

Mother's health was not improving. On April 30, 2012, maternal grandmother asked father to bring mother to her home. Maternal grandmother called for an ambulance after mother continued to complain of serious pain and extreme restlessness throughout the night. When the paramedics arrived, one noted that mother's medications were actually for someone named, "Harmony." Mother was admitted to Pomona Valley Hospital and received treatment for sepsis.

Mother was able to see all of her children before having emergency surgery on the evening of May 5, 2012. After her surgery, father said he was taking Bella home, but

3

then returned to the hospital around 10:00 p.m., left Bella with a stranger in the lobby, and visited mother in the intensive care unit. Maternal grandmother observed it was normal for father to leave Bella with almost anyone, which was one of the reasons she was so involved in Bella's life.

Maternal grandmother returned to the hospital the next morning to see mother. About 15 minutes later, mother "lit up" when father arrived, and asked to speak with him in private. Maternal grandmother and the nurse stood at the end of the bed while the two whispered to one another. When maternal grandmother asked why they were whispering, father responded that mother was just worried about paying rent. This struck maternal grandmother as particularly odd because she and maternal grandfather paid the parents' rent for them. She also found it odd that five minutes after the whispering incident, father said he needed to use the restroom -- even though he just passed the restrooms when entering the hospital. A few minutes later, father returned and leaned over mother's bedside while maternal grandmother spoke with the nurse.

Shortly thereafter, father and maternal grandmother were asked to leave the room while the radiologist took x-rays. Maternal grandmother and father went around a corner where they could not see into mother's hospital room. Suddenly, "bells and whistles" went off and hospital staff began running into mother's room. Father immediately turned to maternal grandmother stating "she has a needle," and that someone had brought in something illegal. At the time, maternal grandmother did not understand. When allowed back in mother's room, they learned that the radiologist found a hypodermic syringe in mother's hand, which appeared to contain black tar heroin. The radiologist stated that within seconds of discovering the needle and a needle mark, mother began convulsing and died. It was later determined that mother died from "acute morphine (heroin) and methadone intoxication" and, pending further investigation, the death was considered an accident.

Questions remain about how mother obtained the needle and heroin. A nurse confirmed that the syringe was not a type used by the hospital. She stated that mother had nothing in her hand when her bedding was changed before visitors came into the

4

room. Maternal grandmother was the first visitor mother had, but the nurse observed their interactions and was confident that neither mother nor maternal grandmother had anything in their hands. The nurse stated that the only time she was not watching mother's every movement was when father returned from the bathroom, bent his head down toward mother, and whispered with mother. Father denied giving mother the syringe, even after reviewing the visitor log-in sheets which showed that only he, maternal grandmother, and the children had been allowed to see mother since her surgery. Father stated that he had been fighting with mother for several years over her drug use and believed that one of her friends brought her the heroin.

The police were notified of the incident. Father was arrested that night on an outstanding warrant for driving under the influence. Father agreed to allow maternal grandfather to watch Bella while father took care of the warrant.

**Detention hearing**

Bella was initially detained on May 5, 2012, and placed in the care and custody of her maternal grandparents. On May 15, 2012, DCFS filed a section 300 petition on behalf of Bella. Father, maternal grandparents, and paternal grandparents were present at the detention hearing. Although father and maternal grandmother originally denied any American Indian heritage, father filed a Parental Notification of Indian Status form at the detention hearing, indicating that he was or may be a member of the "Crow tribe." Next to that statement father wrote, "pat [*sic*] great grandfather, Thomas Crow," and "PGF David Crow." The juvenile court ordered DCFS to "do a full investigation in regard to father's possible American Indian heritage and notice the tribes if appropriate."

The court sustained the petition, finding a prima facie case for detaining Bella and ordering that father have monitored visits as often as could be arranged, but at least four hours per week.

**Adjudication and dispositional hearing**

The adjudication and dispositional hearing was held on July 2, 2012. Father was present to execute a waiver of rights form and plead no contest to the juvenile dependency petition being sustained as follows:

"b-1:  [Father] has an unresolved history of alcohol use, and the father has a criminal conviction of Driving Under the Influence of Alcohol.  The father has not completed the court ordered alcohol rehabilitation program which places child at risk of harm."

"b-5:  On numerous occasions in 2012 . . . [father] placed the three year old child in a detrimental situation in that the child's now deceased mother . . . was under the influence of heroin while the child was in the mother and father's care.  The father should have known of the mother's heroin intoxication, and failed to protect the child.  The father's failure to protect the child endangers the child's physical health and safety and places the child at risk of harm." [3]

Father's counsel filed a "Notice of Child Custody Proceeding for Indian Child," which contained the father's name, address, birth date, and place of birth, and listed "Crow" as the tribe with which father was affiliated; the paternal grandfather's name, birth date, and place of birth; the paternal great-grandfather's name, and his date and place of death.

The juvenile court found by clear and convincing evidence that there were no reasonable means of protecting Bella without removing her from father's physical custody and declared Bella a dependent of the court, placing her in the care of DCFS for suitable placement.  The court ordered DCFS to provide father reunification services and for father to participate in individual counseling, parenting classes, an alcohol abuse program, weekly random and on-demand drug and alcohol testing, and a 12-step program.  Father's monitored visits were increased to at least six hours per week, with DCFS's discretion to liberalize them.  The court further ordered DCFS to submit a progress report with a recommendation concerning Bella's placement, an update on father's visits, and ICWA notices.

Father appeared at the progress hearing on August 3, 2012.  DCFS reported that the dependency investigator had asked father if he had made contact with any family member that had any additional information regarding his American Indian heritage.

---

[3]     Counts b-2, b-3, and b-4 were dismissed.

Father responded that he had been unable to contact any relatives that could provide additional information and he was unable to provide any additional information. Based on this information, DCFS sent an ICWA notice to father, the Bureau of Indian Affairs, the Secretary of the Interior, and the Crow Tribe of the Crow Reservation of Montana later that day. The court ordered that Bella remain a dependent of the court, and placed her with maternal aunt. The case was continued for a six-month status review.

Father was not present at the six-month status review hearing held on December 21, 2012. In light of the minimal progress father had made towards regaining custody, the court found continued jurisdiction necessary to ensure Bella's wellbeing. DCFS also submitted a letter from the Crow Tribe indicating that Bella was not an Indian child. The court reviewed the ICWA notices and correspondence, and found that Bella was not an Indian child as defined by ICWA.

Father appeared at the July 1, 2013 hearing, where he submitted a letter indicating that he had entered a detoxification program and expected to be discharged by June 29, 2013. The juvenile court continued the matter to September 4, 2013, for a contested 12-month review hearing.

In an interview with DCFS, father stated he had been dealing with a lot of guilt and was struggling to find himself. Because he believed it was best for maternal aunt to care for Bella, he discontinued contact with Bella for nine months. Bella reportedly adjusted well and was in regular contact with her sisters. DCFS recommended termination of reunification services and a section 366.26 hearing to terminate parental rights.

Father testified at the contested 12-month review hearing on September 4, 2013. The court found by clear and convincing evidence that father's progress had been "partial," and found by a preponderance of evidence that Bella could not return to father without a substantial risk of detriment to her physical or emotional wellbeing. The court authorized monitored visits at a minimum of eight hours per month, and terminated family reunification services. The court ordered father to return for a section 366.26

7

hearing on January 6, 2014. Father was personally served with written notice of the hearing on October 17, 2013.

**Section 366.26 hearing**

Father was present at the initial selection and implementation hearing on January 6, 2014. Father requested an increase in visitation from eight hours per month to a minimum of four hours per week, and the court granted DCFS discretion to liberalize father's visits. The court also set the contested section 366.26 hearing for February 27, 2014, and ordered father to return on that date. Father was advised that, should he fail to appear, "the court will have to proceed without [him], and [he] will still be bound by the decisions that the court makes in [his] absence." Father was sent written notice of the hearing on January 10, 2014.

Father was not present for the contested selection and implementation hearing on February 27, 2014. His counsel informed the court that both paternal grandmother and father thought the hearing was scheduled for the following day, and that father would not be able to make it to court because he was at work. Father's counsel requested a continuance so that father could be present, however both DCFS and Bella's counsel objected to the continuance. The court denied the continuance request and proceeded with the hearing on the grounds that father was given both verbal notice when he last appeared in court, as well as proper written notice. Father's counsel objected again stating: "[T]his is a very serious matter as the court is prepared to terminate his parental rights today, and I believe that he did intend to testify on his own behalf." Father's counsel then argued that because the parental bond between father and Bella was such that she would be harmed by termination of parental rights, the section 366.26, subdivision (c)(1)(B)(i) parent-child relationship exception applied. According to the DCFS status review report, father had been appropriate during his monthly eight hours of monitored visits, and "he and [Bella] are affectionate and comfortable with one another." Despite father's progress in his sober-living treatment, the court found the evidence did not support a finding of the parent-child relationship exception, and terminated father's

8

parental rights. The court designated maternal aunt as Bella's prospective adoptive parent.

On March 25, 2014, father filed his notice of appeal from the court's February 27, 2014 order terminating his parental rights.

## DISCUSSION

### I. Standard of review

A juvenile court's denial of a request for continuance is reviewed for abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.) The party challenging a ruling on a continuance bears the burden of establishing that the court exceeded the bounds of reason, in light of the totality of the circumstances. (*People v. Beeler* (1995), 9 Cal.4th 953, 1003; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) "When ruling in dependency proceedings, the welfare of the minor is the paramount concern of the court. [Citation.]" (*Guadalupe A. v. Superior* Court (1991) 234 Cal.App.3d 100, 106.) Because time is of the essence in finding permanent placement for dependent children, the juvenile court is afforded particularly broad discretion in determining whether to grant a continuance. Continuances are generally discouraged. (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810-811.)

### II. No abuse of discretion in denying father's continuance request

Father contends that the juvenile court abused its discretion by denying his request for a one-day continuance of the section 366.26 hearing so that he could be present to testify and present evidence on his own behalf. But "'[i]n dependency cases, as in other civil cases, personal appearance by a party is not essential; appearance by an attorney is sufficient and equally effective.' [Citations.]" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 602; *In re J. I.* (2003) 108 Cal.App.4th 903, 912 [finding that confusion about the whereabouts of the client did not establish good cause for a continuance].) Thus, father was not required to be present for the hearing, and his erroneous absence was not good cause for a continuance. (*Jesusa V.*, at p. 602.)

Under section 352, subdivision (a), a continuance may be granted "only for that period of time shown to be necessary by the evidence presented at the hearing on the

motion for the continuance." Father argues that only a one-day continuance was necessary to accommodate for his scheduling mistake, and there was no legal impediment for such slight delay. While the court could have found this to be true, it did not "exceed the bounds of reason" in finding otherwise. Here, the record shows that father's counsel simply asked for "a continuance" so that father could be present at the 366.26 hearing. In effect, counsel's vague language was not a request for a one-day continuance. The juvenile court's denial of counsel's open-ended request was not an abuse of discretion.

Father relies on *In re Hunter W.* (2011) 200 Cal.App.4th 1454, in which this court reversed the juvenile court's order denying requests for a two-hour continuance of a hearing. In that case, the parents of a dependent child checked into court for the morning calendar call, but were not present when the case was called two hours later. The Court of Appeal determined that the juvenile court abused its discretion in refusing to consent to a two-hour delay to locate the parents. In the instant case, father was not present at the juvenile court on the date of the scheduled section 366.26 hearing. Father's counsel stated that father was at work and was completely unable to appear in court that day. Father did not request a brief two-hour continuance; rather he requested a general continuance, extending beyond the day of the scheduled hearing. *Hunter W.* is thus distinguishable.

Father also failed to show good cause for the continuance, beyond stating that his absence was an "honest mistake" and counsel's belief that father intended to testify. Inability to appear on the date scheduled for the section 366.26 hearing is not automatic grounds for a continuance when one received notice of the hearing and was represented by counsel, with whom father had ample opportunity to meet prior to the hearing. (*In re Dolly D.* (1995) 41 Cal.App.4th 440, 445.) At the time of the section 366.26 hearing, father had been given oral notice at the prior hearing, as well as written notice of the hearing date and time via mail. Father was specifically advised that the court would proceed in his absence and that he would be bound by its decisions.

Father's counsel was not certain whether father intended to testify at the section 366.26 hearing and she made no offer of proof as to what evidence father would present.

10

On appeal, the method of determining whether a court ruled correctly in a situation such as this is to examine the offer of proof made by the party seeking to have the evidence admitted. (Evid. Code, § 354, subd. (a).) Such an offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed. (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1124.) Father's *possible* desire to testify to *unknown* facts without an offer of proof does not constitute good cause, and does not mandate a continuance.

Father also argues that the juvenile court could not properly consider a permanent plan without father's testimony, however there is no reason to conclude that testimony from father would have produced evidence reasonably likely to change the outcome of the case. Father had abandoned many of his court ordered obligations, and demonstrated minimal interest in regaining custody of Bella. He failed to comply with individual, grief, parenting, and alcohol counseling; random alcohol testing; and the 12-step program. Father had only sporadically visited Bella over the last year, spending as long as nine months without contact. Though DCFS had reported that father made "positive efforts in the past six months toward his personal sobriety, those efforts [fell] severely short of the stability and care required by a five year old."

These facts do not reflect a likelihood that father could have offered additional information to sufficiently prove that his bond with Bella justified the section 366.26, subdivision (c)(1)(B)(i) exception. Father's testimony about the nature and substance of his visits would not subvert the evidence in the record, and it is unlikely that the court would have resurrected his full parental rights. In light of the oral and written notice provided to father, the juvenile court did not abuse its discretion by denying father's continuance request, and the order terminating parental rights should be affirmed.

## III. ICWA notice

### A. *Standard of review*

The juvenile court's finding proper ICWA notice is reviewed for substantial evidence. This requires evidence that is reasonable in nature, credible, and of solid value. (*In re H.B.* (2008) 161 Cal.App.4th 115, 120.) Because we review factual findings in the

11

light most favorable to the juvenile court's order, when the judgment is supported by substantial evidence, it must not be disturbed.  (*Ibid*.)  "An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error.  [Citations.]"  (*In re G.L.* (2009) 177 Cal.App.4th 683, 695-696.)

### B.  *Substantial evidence supported the juvenile court's finding that DCFS properly complied with ICWA inquiry and notice requirements*

Father contends that the juvenile court wrongfully terminated father's parental rights without complying with ICWA.  He claims that DCFS neglected its duty to further inquire into Bella's Indian heritage, and consequently failed to provide proper ICWA notice to the two potentially interested Crow tribes.  "Congress enacted ICWA to further the federal policy '"that, where possible, an Indian child should remain in the Indian community . . . ."'  [Citation.]"  (*In re W.B.* (2012) 55 Cal.4th 30, 281.)  An Indian child is defined as "a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  [Citation.]"  (*In re H.B., supra*, 161 Cal.App.4th at p. 120; 25 U.S.C. § 1903(4).)  ICWA promotes the stability of Indian tribes by establishing standards for removal of Indian children, minimizing their placement in foster or adoptive homes that do not reflect the unique values of Indian culture.  In furtherance of these goals, ICWA provides procedural and substantive mandates, including inquiry and notice requirements.

While ICWA does not expressly impose any duty to inquire as to American Indian heritage, it allows states to provide a higher standard of protection to the Indian child's parent than provided under ICWA.  (*In re H.B.*, *supra*, 161 Cal.App.4th at p. 120.)  Under California law, formal notice is necessary upon a minimal showing that an Indian child is involved.  (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(b)(1).)  When a child for whom a section 300 petition was filed, the court, county welfare department, and the probation department have an affirmative and continuing duty to inquire into a dependent child's Indian heritage to determine if an Indian child is at risk of entering foster care.  (§ 224.3, subd. (a); accord California Rule of Court, rule 5.481(a).)  Once a

parent completes the Parental Notification of Indian Status form (ICWA-020), and it is determined that the child may hold Indian status, further inquiry is required to properly complete the notice forms. In the instant appeal, father does not challenge the initial inquiry; rather he challenges the sufficiency of DCFS's follow-up inquiry to obtain the information necessary for the ICWA notice.

Section 224.3 provides that, as soon as practicable, the social worker must conduct this further inquiry by interviewing the parents, Indian custodian, and extended family members; contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying information on the tribes; and contacting any other person that reasonably can be expected to have information regarding the child's membership status or eligibility. (§ 224.3, subd. (c); California Rule of Court, rule 5.481(a)(4).) Information required by section 224.2, subdivision (a)(5) includes:

"(A) The name, birth date, and birthplace of the Indian child, if known.

"(B) The name of the Indian tribe in which the child is a member or may be eligible for membership, if known.

"(C) All names known of the Indian child's biological parents, grandparents, and great-grandparents . . . as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known.

"[¶] . . . [¶]

"(F) The location, mailing address, and telephone number of the court and all parties notified pursuant to this section."

If the tribe's identity cannot be determined, notice that the child may be an Indian child must be given to the Bureau of Indian Affairs so that the appropriate tribe can make a determination. (25 U.S.C. § 1912(a); *In re Desiree F.* (2000) 83 Cal.App.4th 460, 470.) "'A tribe's determination that the child is or is not a member of or eligible for membership in the tribe is conclusive.' [Citation.]" (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 255.)

### 1. DCFS obtained all possible information for the ICWA notice

Father complains that after his attorney filed the Notice of Child Custody Proceeding for Indian Child form (ICWA-030), DCFS merely asked father if he had been able to make contact with any family member that would have pertinent information regarding his American Indian heritage. Father contends that this follow-up inquiry was inadequate because the social worker should have sought additional information from paternal relatives.

The Bureau of Indian Affairs guidelines and section 224.2, subdivision (a)(5) requirements are only applicable *if* the information is known. (*In re C.D.* (2003) 110 Cal.App.4th 214, 224-225.) Here, the Notice of Child Custody Proceeding for Indian Child form provided no information apart from listing the father's name, address, birth date, and place of birth, and "Crow" as the tribe with which father was affiliated; the paternal grandfather's name, birth date, and place of birth; the paternal great-grandfather's name, and his date and place of death. DCFS demonstrated an effort to follow-up on the initial inquiry into Bella's possible Indian heritage by contacting father, who told DCFS that he was unable to contact any family member who could provide additional information. DCFS's efforts distinguish the instant case from *In re Francisco W.* (2006) 139 Cal.App.4th 695 where the agency completely failed to follow-up with individuals who reported Indian heritage and who had pertinent information regarding the notice.

Because the ICWA notices contained all possible information that DCFS could obtain, the juvenile court did not err by concluding that additional follow-up inquiry was unnecessary, and that the notices were sufficiently complete. (*In re C.D., supra*, 110 Cal.App.4th at p. 226.)

### 2. DCFS sent notice to the proper Crow tribe

Father alleges that DCFS failed to comply with the ICWA notice requirements because it sent notice to only one of two possible "Crow" tribes. Section 224.2, subdivision (a)(3) requires notice to be sent to all tribes to which the child may be linked until the court makes a determination as to the child's tribe. Father does not contend that

14

DCFS was incorrect in sending ICWA notice to the Crow Tribe of the Crow Reservation of Montana; rather he argues that notice should also have been sent to the Crow Creek Sioux Tribe of the Crow Creek Reservation, located in South Dakota. The Montana tribe to which DCFS sent notice is the only tribe listed in the Federal Register under "Crow," and the Crow Creek Sioux Tribe is listed as a "Sioux Tribe." (Indian Child Welfare Act; Designated Tribal Agents for Service of Notice, 77 Fed.Reg. 45827 (Aug. 1, 2012).)[4] DCFS accordingly sent notice to the only possible "Crow" tribe.

Substantial evidence supports the juvenile court's finding that DCFS complied with the ICWA.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

---

[4]    The California Department of Social Services tribal government listing also reflects that the Crow Creek Sioux Tribe is classified as a Sioux tribe. (http://www.childsworld.ca.gov/res/pdf/cdsstribes.pdf>.)