Filed 5/28/13  In re Devin P. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re DEVIN P. et al., | B242612 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. CK41932) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| D. P. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steven Klaif, Juvenile Court Referee.  Affirmed with directions.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant D. P.

Lori Siegel, under appointment by the Court of Appeal, for Minor Devin P.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

D. F. and his son Devin P. appeal from a dispositional order of the juvenile court. They challenge the sufficiency of the evidence supporting the court's jurisdictional findings pursuant to Welfare and Institutions Code section 300, subdivisions (b), (d) and (j),[1] as to Devin and his sisters, Destiny P. and Deja H. Devin also claims the juvenile court failed to comply with the Indian Child Welfare Act (ICWA). We affirm the dispositional order but remand to the juvenile court with directions to order compliance with ICWA and section 224.2.

## FACTUAL AND PROCEDURAL BACKGROUND

D. F. (Father) and Wilma K. (Mother)[2] are the parents of Devin, Destiny and Deja. Father and Mother are not married and did not live together during the current proceedings. Mother lived in a house with Destiny and Deja and her other children. Destiny, however, often lived with her former foster mother, Cynthia H. Devin lived with Father but sometimes spent the night at Mother's house.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Mother, who is not a party to this appeal, has other children.

2

**A.** *Prior Dependency Proceedings*

Throughout the years, the Department of Children and Family Services (DCFS) received multiple referrals regarding this family, as well as Mother's other children. During 2000 and 2001, this family was under the supervision of the juvenile court after Destiny was born exposed to drugs and alcohol. Voluntary family maintenance services failed. Mother continued to test positive for alcohol, rendering her unable to parent properly and placing her children at risk. During this time, Cynthia H. was foster mother to Destiny and Devin. Deja was not yet born.

During 2008 and 2009, the family again received voluntary services from DCFS.

**B.** *Current Dependency Proceedings*

On November 11, 2010, DCFS received a referral alleging that Mother abused alcohol and neglected Devin (then 12), Destiny (then 10), Deja (then 7) and two of her older children. In response, DCFS opened a voluntary maintenance case to assist the family. A year later, however, Mother continued to test positive for alcohol.

On December 6, 2011, DCFS received another referral, alleging, among other things, that Devin (then 13) had abused Destiny (then 11) sexually and that Destiny was a victim of general neglect by Mother and Father. This referral was made after Destiny disclosed to Cynthia H. that Devin sexually molested her when she spent the night at Father's residence.

During the investigation that followed, Destiny revealed that Devin had sexually molested her on multiple occasions when she visited Father. Destiny later admitted that she lied about being sexually abused because she wanted to stay with Cynthia H. and not go home. The officer investigating the matter concluded that the allegations were unfounded. After DCFS and law enforcement left, Destiny told Cynthia H. that her allegations about being sexually abused were actually true. Later, at the hospital, Destiny told the forensic examiner that Devin sexually molested her. Devin denied molesting his sister.

3

Mother stated that Destiny came home after school but spent most nights in the home of Cynthia H. and that Destiny and Deja visited Father on weekends. Mother denied any knowledge that Devin was sexually abusing Destiny. Mother further relayed that on December 2, Cynthia H. and Destiny became upset when they were told Destiny had to visit Father and could not go to Cynthia H.'s home.

Father was at work when DCFS contacted him. He told the social worker that Cynthia H. was causing problems because she wanted Destiny to live with her full time. Father believed that Cynthia H. was behind the allegations Destiny made against Devin.

DCFS detained all three children on December 12, 2011. Devin was placed in a group home. Destiny and Deja were placed in the home of their former foster parent, Cynthia H.

On December 15, 2011, DCFS filed a section 300 petition on behalf of Devin, Destiny and Deja. The petition alleged that Devin sexually abused Destiny, that Mother and Father failed to protect Destiny and that Deja was at substantial risk of sexual abuse (counts b-1, d-1, j-1). The petition also alleged that Mother had a history of substance abuse and currently abused alcohol (count b-2).

The juvenile court detained all three children from Mother and detained Destiny and Deja from Father. Devin was released to Father.

On March 26, 2012, Cynthia H. filed a request for de facto parent status as to Destiny. The court declined to consider the request until it reached the disposition phase of the proceedings. At this point in time, Destiny and Deja were no longer placed with Cynthia H. They had been removed from her care in January 2012 and replaced with another foster family.

A contested adjudication hearing scheduled for March 26, 2012 was continued a number of times to May 4. Destiny testified she was 12 years old, lived with Deja in a foster home, and no longer lived with Cynthia H. She testified that when she lived with Cynthia H., she sometimes spent the night at Father's home where Devin did something that made her feel uncomfortable. She stated that Devin would "put his thing inside me," referring to his private part. This sexual contact occurred at Father's residence, which

4

Destiny described as a big room. She slept with Deja and Devin on "a little couch, like a bed."

Destiny testified that Devin put his privates into her private area four times and told her not to tell anyone. She further stated that the sexual contact also occurred in an exercise room in a common area of Father's apartment complex at night.

Destiny testified that she told Cynthia H. that she had been sexually abused by Devin. The first time occurred on the couch-bed in Father's apartment. Devin took off her night clothes and his underwear. Destiny did not feel comfortable when Devin put his private part inside hers. As to the incident in the exercise room, Destiny said Devin removed her clothes and moved from left to right while his private part was inside hers. After that, they went back upstairs.

Destiny denied that Devin ever threatened her and acknowledged that she previously claimed he had. She did not know why she had claimed Devin threatened her when it was not true. Destiny did not tell Father about the abuse because she did not think he would believe her. She felt her Father believed her brother. She also did not think Mother would believe her. Destiny denied that Cynthia H. told her to fabricate a story of being sexually abused by Devin.

Destiny remembers the incident when Father and Cynthia H. argued about Destiny going to visit Father. She said they were yelling at each other. Destiny was scared and thought Father and Cynthia H. were going to hit each other. She also was afraid that she was not going to see Cynthia H. again. She went with Father for that weekend and spent two nights at his home with Deja and Devin, after which she returned to Mother's home. Destiny did not like living with Mother because Mother hit her and was often angry.

In addition, Destiny recalled that she was in fifth grade when Devin had sex with her. The last time it happened was on the couch-bed where she was sleeping with Devin and Deja. It was nighttime. Father was asleep on his bed which was about three feet away. Devin was moving in circles on her and it felt hard. She whispered for him to stop. She did not want her Father to know what was happening.

5

Destiny further testified that once at night she had sexual contact with Devin in Father's car. She stated that Father was upstairs while she and Devin spent seven hours in the car. She did not know how many minutes were in an hour, however.

Destiny admitted telling people that she liked living with Cynthia H. because she bought her things and took her to different places. Destiny said Mother drank and often became intoxicated before Destiny made the allegations against Devin. Destiny did not want to live with Mother. She wanted to live with Cynthia H. but had not seen or talked to her since she stopped living with her. She had visits with Mother but not Father. She denied that she was accusing Devin of molesting her so she could live with Cynthia H.

Devin also testified. He described Father's apartment and admitted that his sisters sometimes slept in the same bed with him. Devin claimed he was a virgin and denied placing his penis in Destiny's vagina. He thought Destiny was lying because she wanted to live with Cynthia H. He had observed the argument between Father and Cynthia H. as to who would take Destiny for the weekend. Devin testified that Father sometimes went to sleep before the children.

Father remembered that Destiny and Deja spent the night in his home numerous times in 2011. He testified that he and Devin had their own beds. They were about three feet apart. Father claimed he never slept when the children were awake.

According to Father, when the family's prior dependency case closed, the court gave him joint custody of the children. Devin lived with him, while Destiny and Deja lived with Mother. Although he had weekend visits with the girls, Cynthia H. often interfered with his visits. Father denied that Destiny and Deja lived with Cynthia H. He believed Destiny lived primarily with Mother in 2011.

The juvenile court found by a preponderance of the evidence that there was sexual activity between Destiny and Devin and that Devin initiated the contact. The court sustained the section 300 petition as amended, finding the children at risk of harm due to Devin's sexual abuse of Destiny and Father's failure to protect her, as well as Mother's history of substance abuse and current abuse of alcohol while caring for the children.

The court then continued the matter for disposition and a report addressing the possibility of returning Destiny to Cynthia H.'s care.

In its report, DCFS recommended that the children remain as placed. DCFS did not believe Cynthia H. was able to facilitate family reunification. Father did not want Destiny or Deja placed with Cynthia H. He did not want his daughters exposed to her lifestyle. He further believed that Cynthia H. may have threatened Destiny, causing her to say she wanted to live with Cynthia H.

Although Cynthia H. told the dependency investigator that she would comply with the court's family reunification orders, the investigator did not believe her.

Mother accused Cynthia H. of being obsessed with Destiny and of using prescription medication. Mother denied that she ever gave Destiny to Cynthia H.

On May 15, 2012, the court granted Cynthia H. unmonitored visits with Destiny for four hours per visit, after which Father walked out of the courtroom while the proceedings were in progress. The following day, upon motion of DCFS, the court changed Cynthia H.'s visits back to supervised. In its motion, DCFS asserted that "the child's safety may be compromised if the child were to complete unmonitored visits with Ms. H[.]"

On May 30, 2012, DCFS reported that Destiny enjoyed her family visits, as well as her visits with Cynthia H. When the social worker asked Destiny if she wanted to be placed with Cynthia H., she shrugged her shoulders. She later said she wanted to be placed with Cynthia H., who did a lot of nice things for her. During a monitored visit, DCFS assessed that Cynthia H. controlled Destiny with money and items. The social worker believed Destiny was confused about where she wanted to live.

Cynthia H. testified at the disposition hearing. She asked the juvenile court to place Destiny in her care. She explained that Destiny previously had lived with her as a foster child and had lived with her continuously for about 12 years. Cynthia H. further explained that when the juvenile court terminated the family's previous dependency case, Mother allowed Destiny to stay with Cynthia H. Mother sometimes asked for Destiny to be returned to her care, but later asked Cynthia H. to take care of Destiny again. Cynthia

H. estimated that over the course of 12 years, Destiny had spent the night with Mother 100 times.

Cynthia H. testified that she would not interfere with the parents' efforts to reunify with Destiny. She said she and Mother used to be friends. She also denied ever threatening to call DCFS when she and Father argued over which of them would have Destiny for the weekend.

Father also testified at the disposition hearing. He described his relationship with Cynthia H. as "very bad, shaky throughout the years." Father never agreed that Cynthia H. would care for Destiny on a permanent basis. He recounted specific behaviors of Cynthia H. that he found troubling. He also noted that she had previously threated to call DCFS regarding the children. Father believed that Destiny had lived most of her life with Mother.

At the conclusion of the disposition proceedings, the juvenile court declared the children dependents of the court pursuant to subdivisions (b), (d) and (j) of section 300. The court removed all three children from Mother and removed Destiny and Deja from Father. Devin remained in the custody of Father. The court ordered Father to attend sex abuse awareness counseling and individual counseling to address case issues. It ordered Mother to attend a drug and alcohol rehabilitation program with random testing, sex abuse awareness counseling and individual counseling to address case issues. The court ordered counseling for the children. The court ordered supervised visits for Mother with all three children and for Father with Destiny and Deja. The court stated it was uncomfortable in granting Father unmonitored visits because "[t]here is such a lack of awareness of everything that is going on by the Father." The court ordered Cynthia H.'s visits to remain monitored and granted her petition for de facto parent status.

## DISCUSSION

### A. *Sufficiency of Evidence*

Devin and Father challenge the sufficiency of the evidence to support the juvenile court's jurisdictional findings under subdivisions (b), (d) and (j) of section 300, specifically counts b-1, d-1 and j-1 as amended. Devin maintains that the evidence is insufficient to support the court's determination that he sexually abused Destiny. Father contends there is no evidence that he was aware of any ongoing sexual abuse before DCFS contacted him and thus he did not engage in any conduct justifying the assumption of jurisdiction over the children. He further maintains that at the time of the jurisdictional hearing, it was physically impossible for Destiny or Deja to be sexually abused because the girls were living separate from Devin and Father only had monitored visits with his daughters and the court had ordered no visitation between Devin and his younger sisters.

#### 1. Standard of Review

"We review the court's jurisdictional findings for substantial evidence—evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

#### 2. Sexual Abuse

Since the allegations of sexual abuse by Devin serve as the foundation for counts b-1, d-1 and j-1, we first address and reject Devin's contention that substantial evidence does not support the juvenile court's finding that he sexually abused Destiny.

9

In a nutshell, Destiny maintained that Devin sexually abused her; Devin denied any sexual abuse. While it is true, as Devin maintains, that there were many inconsistencies in Destiny's account of the events, the juvenile court believed her nonetheless. In sustaining the allegations of sexual abuse by Devin, the juvenile court stated: "I think the most consistent of everybody was Destiny. She had some of the details off. She wasn't so consistent that it sounded completely rehearsed. She had sounded normal to me, what is the normal inconsistencies for an 11 year old, 11 to 12. Now, once it happened, and some of the details, it is normal to have no inconsistencies, but she was generally consistent. Devin was all over the place. He was, and he was nervous. He was fidgeting. He got angry, was defensive. And he did not like strong denials, angry and didn't do anything; more like he was getting annoyed that he was getting caught in his inconsistencies. It is possible that Destiny, she may have even exceeded, that may be why she was quiet. But what is clear to me by a preponderance of evidence, more likely than not, there was sexual activity she engaged in and that Devin was the aggressor or, at least, the instigator."

Destiny's accounts of the sexual abuse constitute substantial evidence supporting the court's determination that Devin sexually abused her. Devin's challenges to Destiny's statements and testimony are nothing more than an attempt to have us reweigh the evidence and reassess her credibility, which is not our function. "'It is the exclusive function of the trial court to weigh the evidence, resolve conflicts and determine the credibility of witnesses [citation] and if its interpretation . . . is reasonable, a reviewing court will not disturb the trial court's determination in the matter unless an abuse of discretion is clearly shown [citation].' [Citation.]" (*Tucker v. Pacific Bell Mobile Services* (2010) 186 Cal.App.4th 1548, 1562.) No abuse of discretion has been demonstrated.

The juvenile court may adjudge a child a dependent of the court pursuant to subdivision (d) of section 300 if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or

10

the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

The juvenile court's finding that Devin sexually abused Destiny alone was sufficient for the juvenile court to exercise jurisdiction over Destiny and Deja, who was at substantial risk of sexual abuse by Devin, pursuant to subdivision (d) of section 300.[3] Father, however, challenges the court's further finding that he knew or reasonably should have known about the abuse and failed to protect Destiny and Deja. While there is no evidence that he had actual knowledge of the abuse, substantial evidence does support the juvenile court's findings that Father reasonably should have known about Destiny's abuse and that he failed to protect her. Father permitted Devin to sleep together in the same bed as Destiny and Deja, when they slept over at Father's residence. Given the age of the children, the girls should not have been permitted to sleep in the same bed as Devin. The record also contains evidence, albeit conflicting evidence, that Father did not adequately supervise his children. Indeed, the juvenile court observed, "[Father's] testimony was all over the place. He had almost no clue or no interest what was going on with the kids when they were in his house."

Father asserts that at the time of the jurisdictional hearing, it was physically impossible for Destiny or Deja to be sexually abused because the girls were living separate from Devin and Father only had monitored visits with his daughters, precluding the court from exercising jurisdiction over the girls. We disagree. Interim orders designed to protect the children during the pendency of dependency proceedings do not prevent the court from making the findings necessary to assume jurisdiction. More specifically, "a finding of current risk is [not] required . . . for jurisdiction under subdivision (d)" of section 300. (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803.)

---

**3**     Neither Father nor Devin challenges the juvenile court's finding that Devin was a member of Destiny's household.

### 3. Failure To Protect

The juvenile court may adjudge a child a dependent of the court pursuant to subdivision (b) of section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.] However, we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

In this case, the juvenile court adjudged the children dependents pursuant to section 300, subdivision (b), as a result of Mother's history of substance abuse and her current abuse of alcohol (count b-2) and Father's failure to protect Destiny from Devin's sexual abuse (counts b-1, d-1 and j-1). Inasmuch as neither Devin nor Father challenges the juvenile court's determination that Devin and his sisters are dependents pursuant to section 300, subdivision (b), as a result of the Mother's conduct, we must uphold the

12

court's determination that the children are dependents of the juvenile court under that particular subdivision.

Father maintains, however, that he personally did not engage in any conduct justifying the assumption of jurisdiction over the children pursuant to subdivision (b) of section 300 because he was unaware of any ongoing sexual abuse before DCFS contacted him and informed him about the abuse. We disagree. As noted above, the record contains evidence, albeit conflicting evidence, that Father did not adequately supervise his children. Since Destiny clearly suffered physical harm while in Father's care, and Deja was at substantial risk for similar harm (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397), the court's assertion of jurisdiction over all three children pursuant to subdivision (b) of section 300 is unassailable.

### 4. Abuse of Sibling

"Section 300, subdivision (j) provides a basis for juvenile court jurisdiction where the child's sibling has been abused or neglected, as defined in section 300, subdivisions (a), (b), (d), (e) or (i), and there is a substantial risk the child will be abused or neglected, as defined in any of those subdivisions. [Citation.] Where, as here, the petition alleges the child's sibling has been sexually abused as defined in subdivision (d), the court can take jurisdiction under subdivision (j) if the evidence shows there is a substantial risk that the child who is the subject of the dependency proceedings will be sexually abused, as defined in Penal Code section 11165.1, by his or her parent or a member of his or her household. (§ 300, subd. (d); *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1411 . . . .)" (*In re R.V.*, *supra*, 208 Cal.App.4th at pp. 842-843.)

In light of the juvenile court's finding that Devin sexually abused Destiny, it was justified in finding that Deja, who was only three and a half years younger than Destiny, was at substantial risk of being sexually abused by Devin as well. This is particularly true, in that Father never believed that the abuse occurred. Rather, he believed the claims of abuse had been manufactured so that Destiny could remain with Cynthia H.

13

**B.** *Indian Child Welfare Act (ICWA)*

Devin contends the juvenile court failed to ensure compliance with the mandates of ICWA (25 U.S.C. § 1901 et seq.) and DCFS should be required to conduct an investigation and to give notice to applicable Indian tribes regarding the current dependency proceedings. We agree.

### 1. Relevant Facts

In its detention report, DCFS reported that ICWA did not apply, presumably because in prior proceedings the court found ICWA did not apply. On the day of the initial detention hearing, however, Father filed a Parental Notification of Indian Status (Cal. Rules of Court, rule 5.481) in which he noted that he may have Indian ancestry and specified the "Creek" tribe. After the juvenile court noted that it did not believe this had been an ICWA case in the past, the following colloquy between DCFS's counsel, Zina Engebretsen, and Father transpired:

"MS. ENGEBRETSEN: If the father — why do you believe there's Creek heritage in your family?

"THE FATHER: That's on my mom's side, and she often spoke of that. It was —

"THE COURT: Speak up, sir.

"THE FATHER: It was on my mom's side . . . of the family, and I was told by my mom and my grandmother, you know, that her grandmama husband was an Indian, you know.

"MS. ENGEBRETSEN: So your grandmother's husband was that your grandfather?

"THE FATHER: My grandfather wife — my grandfather on my mom's side mother was an Indian, Creek Indian.

"MS. ENGEBRETSEN: Like on a reservation or —

"THE FATHER: Huh?

14

"MS. ENGEBRETSEN:  Do you have more information about whether she was on a reservation, an Indian reservation, or she talked about having Indian heritage in her background?

"THE FATHER:  Yes.  That's all I can tell you.  I'm not so sure.  It's been so long.  My grandmother has passed since, and my mom's passed so — "

At this juncture, Attorney Engebretsen conferred with Father and his attorney. She thereafter informed the juvenile court that Father believed his great-grandmother was an Indian.  Father confirmed this fact.

Counsel for DCFS then stated, "And the I.C.W.A. heritage has to do with we go back four generations, and I believe that's too far.  So I don't believe that's triggered." She nevertheless suggested that the court order DCFS to follow up and give the court an update in the next report.  The juvenile court stated, "I'll find at this time I have no reason to believe the Indian Child Welfare Act applies in this case, but D.C.F.S. is ordered to interview the Father . . . and further — and provide further update on I.C.W.A. for the next report."  Its minute order memorialized its "order[] that the Department investigate the Father's American Indian heritage and notice the tribes if necessary."  It further stated, "The CSW is ordered to contact the party claiming possible American Indian heritage and investigate that claim.  The CSW is to provide to the court a supplemental report regarding that investigation.  Said report should include the details of who was interviewed, dates and places of birth of the relative as far back as can be ascertained.  [¶] The CSW is then to notice the Bureau of Indian Affairs and the appropriate tribes. Copies of the notices, the returned receipts from these notices, and any correspondence letters are to be submitted to the court for the next court date."

In its jurisdiction/disposition report, DCFS stated that "father reported all of his immediate relatives are deceased and he would need to speak with his cousin so he can get the names and dates of birth for his relatives.  Father stated he will contact [the dependency investigator] with the information."  The record contains no further mention of ICWA or any indication that Father ever provided the dependency investigator with any information establishing his Indian heritage.

15

## 2.  Applicable Law

As previously noted, the juvenile court determined that it had no reason to believe ICWA applied.  We review the court's ICWA findings for substantial evidence.  (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467; *In re E.W.* (2009) 170 Cal.App.4th 396, 403-404.)

ICWA's purpose is to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."  (25 U.S.C. § 1902; *In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174.)  For purposes of ICWA, an "Indian child" is an unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4); *Karla C.*, *supra*, at p. 174.)

ICWA presumes that "it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource."  (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.)  Accordingly, "[t]to ensure a tribe's right to intervene, the ICWA requires 'where the court knows or has reason to know that an Indian child is involved,' the party seeking [foster care or] termination of parental rights must, in relevant part, notify the Indian child's tribe of the pending proceedings and its right to intervene."  (*Ibid.*; accord, *In re J.D.* (2010) 189 Cal.App.4th 118, 123.)  This notice "enables the tribe to investigate and determine whether the minor is an Indian child" and "advises the tribe of the pending proceedings and its right to intervene or assume tribal jurisdiction."  (*Desiree F.*, *supra*, at p. 470.)  Failure to provide the necessary notice requires invalidation of actions taken in violation of ICWA.  (*Id.* at p 472.)

California law contains its own notice requirements (§ 224.2, subd. (a)(5)) where the juvenile court or DCFS knows or has reason to know that the dependency proceedings involve an Indian child.  (§ 224.3, subd. (d).)  The state also imposes a "continuing duty in dependency proceedings to inquire whether a child might be an Indian child."  (*In re J.D.*, *supra*, 189 Cal.App.4th at p. 123; Cal. Rules of Court, rule 5.481(a).)  If the protections provided by state law are greater than the protections

provided by ICWA, state law governs. (§ 224, subd. (d); accord, 25 U.S.C. § 1921; *In re H.B.* (2008) 161 Cal.App.4th 115, 120.)

Neither ICWA nor the governing federal regulations define the term "reason to know." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1158.) California law provides guidance in making this determination, however. Section 224.3, subdivision (b), provides: "The circumstances that may provide reason to know the child is an Indian child include, but are not limited to, the following:

"(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe.

"(2) The residence or domicile of the child, the child's parents, or Indian custodian is in a predominantly Indian community.

"(3) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the Indian Health Service."[4]

---

[4] California Rules of Court, rule 5.481(a)(5) provides similar guidance. It provides: "The circumstances that may provide reason to know the child is an Indian child include the following:

"(A) The child or a person having an interest in the child, including an Indian tribe, an Indian organization, an officer of the court, a public or private agency, or a member of the child's extended family, informs or otherwise provides information suggesting that the child is an Indian child to the court, the county welfare agency, the probation department, the licensed adoption agency or adoption service provider, the investigator, the petitioner, or any appointed guardian or conservator;

"(B) The residence or domicile of the child, the child's parents, or an Indian custodian is or was in a predominately Indian community; or

"(C) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the U.S. Department of Health and Human Services, Indian Health Service, or Tribal Temporary Assistance to Needy Families benefits."

Notice pursuant to ICWA must contain sufficient information to be meaningful. (*In re Robert A.* (2007) 147 Cal.App.4th 982, 989; *In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.)  As such, it must include all available information about the child's parents, maternal and paternal grandparents and great grandparents, especially those with alleged Indian heritage, including maiden, married and former names and aliases, birthdates, places of birth and death, current and former addresses, and information about tribal affiliation including tribal enrollment numbers.  (*Francisco W. supra*, at p. 703.)

### 3.  Analysis

DCFS asserts that ICWA's notice requirements were never triggered because the information provided by Father did not provide any reason to believe the children had Indian ancestry.  In support of this assertion, DCFS relies on *In re O.K.* (2003) 106 Cal.App.4th 152, *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514 and *In re J.D.*, *supra*, 189 Cal.App.4th 118, which hold that vague and speculative statements do not trigger ICWA's notice requirements.

In *In re O.K.*, *supra*, 106 Cal.App.4th 152, at the section 366.26 hearing, the paternal grandmother said, "'the boy—the young man may have Indian in him.  I don't know my family history that much, but where were [*sic*] from it is that section so I don't know about checking that.'"  (*O.K.*, *supra*, at p. 155.)  The paternal grandmother further stated that "she was not an enrolled member, she did not know whether she or the father was eligible for membership and she was not able to identify a particular tribe or nation."  The father made no comment.  (*Ibid.*)  The appellate court rejected the father's assertion that the information provided by his mother gave the juvenile court reason to know the children might be Indian children because she was a close relative.  It concluded that the information "was too vague and speculative to give the juvenile court any reason to believe the minors might be Indian children."  (*Id.* at p. 157.)

In *In re Jeremiah G.*, *supra*, 172 Cal.App.4th 1514, the Court of Appeal noted that "a claim that a parent, and thus the child, 'may' have Native American heritage is

18

insufficient to trigger ICWA notice requirements if the claim is not accompanied by other information that would reasonably suggest the minor has Indian ancestry." (*Id*. at p. 1516.) The father advised the juvenile court that he might have some Indian ancestry and the matter had to be researched. He did not mention a particular tribe and did not know if his great-grandfather had been a member of a tribe. The mother denied any Indian ancestry and the father later retracted his claim of Indian ancestry. Under these circumstances, the appellate court concluded that "the trial court properly proceeded without ICWA notice." (*Id*. at p. 1521.)

In *In re J.D.*, *supra*, 189 Cal.App.4th 118, "the children's paternal grandmother had told the Department that 'I can't say what tribe it is and I don't have any living relatives to provide any additional information. I was a little kid when my grandmother told me about our Native American ancestry but I just don't know which tribe it was.'" (*Id*. at p. 125.) The Court of Appeal concluded, "This information is too vague, attenuated and speculative to give the dependency court any reason to believe the children might be Indian children." (*Ibid*.)

DCFS's reliance on *In re O.K.*, *supra*, 106 Cal.App.4th 152, *In re Jeremiah G.*, *supra*, 172 Cal.App.4th 1514 and *In re J.D.*, *supra*, 189 Cal.App.4th 118 is misplaced. In this case, Father stated that his own maternal great-grandmother was an Indian, and he identified the Creek tribe. This critical information distinguishes this case from *O.K.*, *Jeremiah G.* and *J.D.*

Although Father's mother and grandmother were deceased and he did not know the children's maternal great-great-grandmother's identifying information, he stated he would get the necessary information from his cousin and give it to the dependency investigator. While there is no indication in the record that Father ever did so, his failure did not relieve DCFS of its own obligation to conduct an investigation as to the possibility that the children were of Indian ancestry. (Cal. Rules of Court, rule 5.481(a);

19

25 U.S.C. § 1903(2).)[5] DCFS should have asked Father for his cousin's name and contact information and itself attempted to obtain the information necessary to provide ICWA notice. Its failure to do so cannot be countenanced.

As observed in *In re Christian P.* (2012) 208 Cal.App.4th 437, "'a notice violation under ICWA is not jurisdictional in the fundamental sense, but instead is subject to a harmless error analysis. [Citations.]' [Citations.] '"[T]o hold otherwise would deprive the [trial] court of all authority over the dependent child, requiring the immediate return of the child to the parents whose fitness was in doubt." [Citation.] An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error. [Citations.]' [Citation.]" (*Id*. at p. 452.)

Here, Devin has neither argued nor pointed to any facts that support the conclusion that the juvenile court's jurisdictional findings or dispositional orders would have been more favorable in the absence of DCFS's omissions. "Therefore, rather than reversal, the

---

**5** California Rules of Court, rule 5.481(a) in pertinent part provides: "(4) If the social worker, probation officer, licensed adoption agency, adoption services provider, investigator, or petitioner knows or has reason to know that an Indian child is or may be involved, that person or entity must make further inquiry as soon as practicable by:

"(A) Interviewing the parents, Indian custodian, and 'extended family members' as defined in 25 United States Code sections 1901 and 1903(2), to gather the information listed in Welfare and Institutions Code section 224.2[, subdivision ](a)(5), Family Code section 180[, subdivision ](b)(5), or Probate Code section 1460.2[, subdivision ](b)(5), which is required to complete the *Notice of Child Custody Proceeding for Indian Child* (form ICWA-030);

"(B) Contacting the Bureau of Indian Affairs and the California Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or eligible for membership; and

"(C) Contacting the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility."

The term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

20

proper remedy here is a limited remand to allow DCFS to comply with ICWA, with directions to the trial court that depend on the outcome of such notice.  [Citations.]"  (*In re Christian P.*, *supra*, 208 Cal.App.4th at p. 452.)

## C.  *Partial Abandonment of Appeal by Father*

Father's notice of appeal also states that he is appealing from the "De Facto status of Ms. Cynthia H[.], visitation orders for Cynthia H[.]"  Father has not addressed these orders in his appellate briefs.  As such, he has abandoned his appeal as to these particular orders.  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538; *Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 578; *Guardianship of Paduano* (1989) 215 Cal.App.3d 346, 348, fn. 1.)

## DISPOSITION

The dispositional order is affirmed.  The matter is remanded to the juvenile court with directions to order DCFS to comply with ICWA.  If, after inquiry and proper notice, the court finds that Devin, Destiny and Deja are Indian children under ICWA, the court shall proceed in compliance with ICWA and section 224 et seq.  If, however, the juvenile court finds that the children are not Indian children, DCFS's prior omissions become harmless error.

JACKSON, J.

We concur:

PERLUSS, P. J.                    WOODS, J.

21