Filed 9/16/14  In re Destinee D. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DESTINEE D. et al., Persons Coming Under the Juvenile Court Law. | B252752 (Consolidated with B253510) (Los Angeles County Super. Ct. No. CK77520) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JAMIE D., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Teresa Sullivan, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jaime D. (father) appeals from juvenile court orders (1) denying a continuance of the hearing on his Welfare and Institutions Code section 388[1] petition, (2) establishing a legal guardianship (§ 366.26) for his two children, Destinee D. (Destinee) and Jaimee D. (Jaimee), and (3) ordering monitored visitation for father with his children.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention Report* (*June 3, 2009*)

This family came to the attention of the Department of Children and Family Services (DCFS) on May 30, 2009, when the children's mother, Tiffany O. (mother), was arrested in California following an altercation with her boyfriend, David R. (David). DCFS detained Destinee and Jaimee and placed them with nonrelative extended family members, Mr. and Mrs. C.

DCFS noted in the detention report that the children had resided in Maryland with father until around September 2008, when they were released to mother and flown to California.

At the detention hearing, the juvenile court ordered monitored visits for mother and father.

*Jurisdiction Report* (*Aug. 12, 2009*)

Mother and father met in 2003. In May 2004, Destinee was born. The family moved to Maryland in 2005. Jaimee was born in early 2006. Later in 2006, mother moved back to California with the children. She then returned to Maryland after a child welfare referral was made in California.

Removal from Father in Maryland (2008)

A Maryland social worker reported that the family had four different cases with the Maryland child protective agency between 2006 and 2008. As is relevant to the issues in this appeal, the Maryland child protective agency reported that father had a

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

history of psychological issues, including depression and suicide attempts. He also had issues with alcohol and substance abuse.

The Maryland agency convened a meeting, at which the paternal family stated that they would become more involved and assist father in caring for the children, though they later failed to do so. The agency returned the children to father. Soon thereafter, reports began to come in, alleging that father was neglecting the children.

Father received five months of services from the Maryland agency. However, he refused to work with the agency the majority of the time, and he did not enroll in any of the recommended programs. In August 2008, the Maryland agency determined that father could not care for the children, and they were again placed in foster care.

The agency informed mother of the children's detention and placement. She went to Maryland for a September 2008 hearing, and the Maryland court released them to her.

In July 2009, the Maryland social worker stated that if DCFS released the children to father, "it would be a matter of months before the kids would be taken back into custody." She said that the children essentially raised themselves. Despite being advised of some of the available service providers, father did not cooperate with the services in Maryland, did not enroll in parenting classes or therapy, and did not take responsibility for anything.

Telephone Interview with Father (July 24, 2009)

The dependency investigator spoke with father by telephone on July 24, 2009. Father acknowledged that mother had a drug problem, had hit the children, had been diagnosed with bipolar disorder, and would often yell and break things. The Maryland police had visited the family home for domestic disputes three times between December 2006 and January 2007.

Father said that he had no idea why the Maryland agency detained the children from him. He had used methamphetamine in the past, but stopped after a court-ordered drug treatment program. He denied having a drug or alcohol problem. Father said that he had an anxiety disorder and had been hospitalized for a panic attack. He said that his anxiety disorder was controlled through medication.

3

He informed the social worker that he had difficulty getting telephone calls through to his daughters. He represented that he would comply with court-ordered services.

Interview with Mother

Mother said that father did not properly care for the children. He usually slept all day, leaving he children crying and unsupervised. He was usually depressed. He had threatened to commit suicide throughout their relationship, and had attempted suicide once before she met him. He also had problems with alcohol.

Interview with Mrs. C.

Mrs. C. stated that she had known mother since mother was one-year-old. They reconnected in August 2008, and Mrs. C. began helping mother with the children. Whenever mother became frustrated with the children, she would call the C.'s to help, and they would babysit.

DCFS assessed the C.'s home under the Adoption and Safe Families Act (ASFA) and found that the home met the requirements.

Interview with Destinee

When she was interviewed in July 2009, Destinee indicated that she could not recall anything about father. She said that she wanted to live with mother and that she liked the C.'s.

*Jurisdiction/Disposition Hearing* (*Aug. 12, 2009*)

Father appeared for the hearing. The juvenile court ordered DCFS to arrange a telephone visitation schedule for father and to determine what programs were available to him in Maryland. He tested negative for drugs and alcohol that day.

*Children are Replaced to a Foster Home*

On August 17, 2009, at the C.'s request, the children were replaced to a foster home.

*Supplemental Report* (*Sept. 9, 2009*)

DCFS identified several service providers for father in Maryland, which could provide parenting, psychiatric treatment, therapy, substance abuse, and drug and alcohol

4

testing programs. Father confirmed that he had been referred to services previously, but he did not attend because of the waiting list and his work schedule.

Father's Medical Records

DCFS provided records of two times that father had been hospitalized in Maryland for suicide attempts. According to those records, father had been diagnosed with bipolar disorder as a teenager, but no longer took his medication. His depression had been heightened on one of the days he attempted suicide because he did not have childcare for the girls and he had to go to work; he also needed to find a new place to live. Father was diagnosed with depressive disorder, bipolar disorder, suicidal ideation, generalized anxiety disorder, drug abuse in remission, and episodic alcohol intoxication.

Custody Evaluation (June 2007)

DCFS also provided the juvenile court with a copy of the family's custody evaluation from June 2007. Mother told the evaluator that father neglected the children by sleeping all day, not watching the girls, and not changing or bathing his daughters. She also reported that father had a drinking problem and about his drug abuse. And, mother informed the evaluator of an incident of domestic violence.

Father reported past suicide attempts. He reported cutting on his arms due to stress in the past year. He had had two drunk driving convictions. He had been in substance abuse treatment, but he continued to drink socially. He admitted to having been arrested for domestic violence, but described it as a misunderstanding.

The evaluator observed that father was appropriate with his children. She noted that both mother and father had a "considerable history of psychopathology, dysfunctional relationships and past and/or present substance abuse." Father had the more stable home environment at that time. She recommended psychological and substance abuse evaluations and testing for both parents.

*Jurisdiction/Disposition Hearing* (*Sept. 18 & 25, 2009*)

At the hearing, the juvenile court sustained an amended section 300 petition on behalf of Destinee and Jaimee.[2] Although he was not present in court on either date, father informed his attorney by telephone that he agreed to the mediated settlement.

As against father, the sustained amended petition alleged that he "failed to provide the children with the necessities of life since 2008, placing them at risk of harm" (count b-6); "has a history of emotional problems including anxiety and depression. On or about August '08, . . . father was hospitalized for suicidal attempt. Due to father's emotional condition, father is unable to provide regular care for the children, thus, placing the children's physical and emotional health and safety at risk of harm" (count b-8); and "has a history of substance abuse and is a recent abuser of alcohol which interferes with his ability to provide regular care and supervision of the children, thus, placing them at risk of harm" (count b-9).

The children were removed from the parents' custody. The parents were ordered reunification services and monitored visitation. Father was ordered to participate in a drug rehabilitation program with random testing, individual counseling to address mental health and other case issues, and psychiatric care and consultation for consistent use of psychotropic medication.

*Progress Report* (*Nov. 6, 2009*)

In November 2009, the social worker reported that she had made several attempts to contact father, but the calls did not go through.

*Status Review Report* (*Mar. 26, 2010*)

The social worker reported that she had attempted to contact father on several occasions, but could not reach him.

---

**2** An amended petition was also sustained on behalf of the girls' half-sibling, James D. (James). (2 CT 511) Neither he nor his father is a party to this appeal. But, it is important to note that James was eventually placed with the C.'s with Destinee and Jaimee.

On March 19, 2010, the social worker received a call from father for the first time. He said that he was working full time as a marketing director. He represented that he had enrolled in an alcohol program and that he was participating in individual and group counseling, AA meetings, and random testing. He said that he was on probation in Maryland, but was trying to get discharged early so that he could move to California to reunite with his children. He stated that he would get a copy of his progress report and fax it to the social worker as soon as he could.

*Initial Six-month Review Hearings* (*Mar. 26 & Apr. 1, 2010*)

Father appeared at both of these hearings.

*Supplemental Report* (*Apr. 20, 2010*)

The children's caregiver reported that the children were very aggressive, particularly Destinee.

*Children are Replaced with the C.'s*

On June 15, 2010, DCFS placed the children with the C.'s. Meanwhile, Destinee suffered from a variety of emotional issues; her psychiatrist prescribed psychotropic medication to address her mental health issues and behaviors.

*Status Review Report* (*Nov. 3, 2010*)

Destinee reported that she liked living with the C.'s, but said that she wanted to live with mother. She did admit to telling Mrs. C. that she wanted to live with the C.'s. Jaimee also stated that she liked living with the C.'s, but that she wanted to live with mother. Both girls were in therapy.

DCFS learned that father had been arrested for disturbing the peace and drinking alcohol in public. He pled guilty.

According to father, he then enrolled in a drug and alcohol program. He participated for a few sessions. But, after he came to California to appear in dependency court and returned to Maryland, he was dropped from the drug and alcohol program. He provided a form from the Health Department showing that he had enrolled in a program in February 2010 and had completed four group sessions and missed one and completed three individual sessions as of March 22, 2010.

7

Father spoke with the social worker on October 14, 2010, about the criminal recent charges and his planned program for group counseling, individual counseling, and random drug testing. He said that he would forward the paperwork after he began the program and that he needed more time to complete services.

*Interim Review Report* (*Dec. 13, 2010*)

After the children had been with the C.'s for over a month, the social worker noted on a visit that the girls "appeared to be very calm and different from their behaviors in foster care. The children were easily redirected and appeared to feel at home."

DCFS also reported that mother gave birth to her fourth child, Allison D. (Allison),[3] in August 2010. She was placed with the C.'s in November 2010 after mother tested positive for methamphetamine.

*Status Review Report* (*June 3, 2011*)

In early 2011, the social worker was unable to get in touch with father. She sent him several contact letters. She was able to leave him a telephone message in May 2011. He never sent any information on the drug treatment program that he said he was starting.

Meanwhile, the girls said that they were happy and doing well with the C.'s. They wanted to remain with them. The C.'s were willing to adopt if the children did not reunify.

The girls informed the social worker that the C.'s sometimes spanked them. The social worker spoke with the C.'s, and they agreed not to spank the children.

The children's therapist reported that they suffered from Post Traumatic Stress Disorder and needed to remain in a safe environment.

*Interim Review Report* (*Aug. 11, 2011*)

The children continued to report that they wanted to remain with the C.'s. At some point, the cleanliness of the home was found to be "very marginal." Mr. C. also admitted that he used hot sauce in the children's mouths as a form of discipline. DCFS addressed these issues with the C.'s, who began working on cleaning the home and

---

[3]     Neither Allison nor her father is a party to this appeal.

8

conducting some home repairs; the social worker made unannounced visits and found the home had improved. Moreover, the C.'s were complying with the discipline techniques.

*Supplemental Report* (*Sept. 28, 2011*)

In September 2011, Destinee told the social worker that she was ready to go home. At the same time, Jaimee stated that she wanted to remain with the C.'s.

Regarding father, DCFS reported that he had not completed any of the court-ordered programs. Although a contact letter was mailed nearly every month, father had no contact with DCFS to inquire about the children or what he needed to do to reunify with them.

*18-month Review Hearing* (*Sept. 28, 2011*)

At the 18-month review hearing, the juvenile court returned the children to mother, with family maintenance services. Father was not present at the hearing. The juvenile court found that he was not in compliance with the case plan and terminated his family reunification services.

*Status Review Report* (*Mar. 28, 2012*)

In March 2012, DCFS reported that mother was often overwhelmed with her children's negative behaviors. The C.'s helped mother with respite care.

*Detention Report* (*July 2012*)

In July 2012, the children were removed from mother after a domestic violence incident between mother and David. Destinee told the investigating social worker that father lived in Maryland and that she had not seen him in two years. The children were placed in foster homes. DCFS sent notice to father, but father did not appear at the detention hearing. He was, however, ordered to have monitored telephone contact with the girls.

*Progress Report* (*Oct. 30, 2012*)

After several hearings and reports, Destinee and Jaimee were eventually placed with paternal relatives, the D.'s. The C.'s were approved to monitor mother's weekly three-hour visits with the children.

*Progress Report and Letter from the C.'s* (*Dec. 12, 2012*); *Court Hearing*

On December 12, 2012, the C.'s sent a letter to the juvenile court, advising that they wanted "to have legal guardianship or adopt all 4 children [Destinee, Jaimee, James, and Allison]."

Meanwhile, the D.'s had notified DCFS that they could no longer care for the girls; their behaviors were reportedly so great that they put the D.'s and their children in danger. And the C.'s home had been approved for placement.

At the December 2012, hearing, the juvenile court ordered that Destinee, Jaimee, and James be placed with the C.'s; Allison was placed with her paternal grandmother, with Mrs. C. providing childcare for Allison. Father appeared at that hearing—for the first time since April 1, 2010.

*Father's First Section 388 Petition*

On January 28, 2013, father filed his first section 388 petition. DCFS responded to the petition, noting that the girls wanted to stay with the C.'s. The C.'s told the social worker that they felt that the children finally had stability in their lives. Both Destinee and Jaimee said that they did not want to live with father. In fact, just the subject of leaving the C.'s home made Destinee's stomach hurt.

Father did not appear at the original hearing date or at the continued hearing date, and the juvenile court denied his section 388 petition.

*Last Minute Information for the Court* (*May 28, 2013*)

Allison was placed with the C.'s on May 3, 2013.

Unfortunately, the C.'s adoption homestudy was halted due to problems with the references that they provided. The C.'s were informed that they could pursue legal guardianship, and they agreed. All of the children were doing very well with the C.'s.

*Section 366.26 Report* (*May 28, 2013*)

This DCFS report provided an overview of the family contact history. Father had a monitored visit with the girls on August 11, 2009. He next visited the children in late March 2010. As of March 2011, he had had no more reported visits. On August 14, 2012, father contacted DCFS to find out what had happened to the girls. In December

2012, father came to California and began visiting the children, with those visits monitored by the C.'s. In January 2013, the girls were upset after a visit in which father talked to them about going to live with him.

On April 16, 2013, the girls told the DCFS social worker that they did not want to live with father or mother. On April 25, 2013, the children told Mrs. C. (and then the social worker) that they did not want to talk to father daily because he asked the same questions every night.

The C.'s visitation log showed that father visited the girls four times in December 2012, eight times in January 2013, and twice in May 2013. These visits lasted between one hour and two-and-a-half hours. He also visited at least once in early June 2013 for half an hour.

Meanwhile, the C.'s remained committed to providing permanency for the children through legal guardianship. They loved the children. They had been caring for them off and on for five years. They wanted to raise them together in a safe and secure home. They were able to meet their needs.

On June 17, 2013, both Destinee and Jaimee told the social worker that they wanted to stay with the C.'s.

*Father's Second Section 388 Petition* (*June 26, 2013*)

On June 26, 2013, father filed his second section 388 petition, asking that the children be placed with him, that he be allowed unmonitored and overnight visits, that reunification services be reinstated, or that the children be placed with relatives. According to father, circumstances had changed because the C.'s would not be adopting the children, father had completed the reunification services previously ordered, he was employed and had a home furnished for the children, he was participating in counseling, he and the children had a strong bond and spoke by telephone or internet three to six times per week, and he was in a stable relationship with his fiancée. He also argued that these changes were in the girls' best interests because they could reunify with a biological parent, they wanted to be with father, he was willing to engage in services, the children would be with supportive extended family, and the children's attachment to the C.'s and

11

placement in a stable but nonpermanent home would not outweigh the benefits of return to father.

Father appeared at the hearing on July 1, 2013, at which time the juvenile court set a hearing on his second section 388 petition for August 15, 2013. It ordered father to return on that date.

*DCFS's Response to Father's Second Section 388 Petition*

DCFS asserted that it was in the children's best interests for the juvenile court to deny father's second section 388 petition. He had only maintained abstinence from alcohol for the past 30 days; over an eight-month period, he had four positive and nine negative alcohol tests. His prognosis was "'GUARDED.'"

His October 2012 psychological evaluation indicated that father reported seven months of sobriety (contrary to the information from his alcohol program). Father had long-term serious mental health and substance abuse problems, which were likely to recur, particularly without treatment. Father presently suffered from anxiety and adding two daughters would not help.

DCFS also had concerns about involving the children in an apparently complicated situation between father and his fiancée.

While father claimed that he had never been found to have abused or neglected the children, the information from the Maryland agency was to the contrary.

In July 2013, the social worker spoke with the girls, who both said that they did not want to live with father. They did not want to leave the C.'s because they felt safe with them. In fact, their therapist said that their severe behaviors had decreased while the girls were living with the C.'s. Both girls had shown improvement. Their support team believed that moving the girls out of the C.'s home would be detrimental to their mental and emotional stability.

That said, monitored visits between father and the children were appropriate.

Regarding father's request that the children be placed with family, DCFS noted that the children considered the C.'s to be family. The C.'s had been active in the children's lives since September 2008.

12

*Children's Opposition to Father's Second Section 388 Petition*

The girls also opposed father's second section 388 petition. They argued that it was "not in their best interests to remove them from their stable placement, where they are comfortable and happy, and reside with their half-siblings." They reiterated that they had a strong relationship with the C.'s and consistently stated that they wanted to remain with the C.'s and not be sent to live with father.

*Continued Hearing* (*Aug. 15, 2013*)

Father appeared at the hearing but, "with great regret," the juvenile court continued the hearing on father's second section 388 petition to October 4, 2013. Father was ordered to return on that date.

*Documents Filed for October 4, 2013, Hearing*

Father filed a witness list and various supplemental exhibits.

DCFS filed a last minute information for the court, recommending that the C.'s be granted legal guardianship. DCFS pointed out that "[a]ll of the issues in question regarding the prospective Legal Guardians['] previous referrals and the home study withdrawal were addressed . . . in a Permanency Meeting held at" DCFS offices.

*Hearing on Father's Second Section 388 Petition* (*Oct. 4, 2013*)

Father did not appear at the hearing. His attorney said that she had spoken to him prior to that day and that her office had tried to reach him, but was only able to leave a voicemail. Because "an essential witness" was unavailable, counsel requested a continuance.

The juvenile court denied the request for a continuance, noting that the matter had already been continued a number of times.

Father's counsel then argued the merits of his section 388 petition. The children, DCFS, and mother all argued through counsel that father's second section 388 petition should be denied.

After considering DCFS's reports, father's thorough section 388 petition, DCFS's response, and the children's opposition, the juvenile court denied father's section 388 petition without prejudice.

13

*Father's Motion for Reconsideration*

On October 10, 2013, father filed a motion for reconsideration. He claimed that there had been miscommunication between himself and his attorney. He wanted the juvenile court to reconsider and allow him and his witnesses to testify about his progress as he would never have intentionally missed the hearing.

*Status Review Report* (*Oct. 17, 2013*)

Meanwhile, the children were thriving with the C.'s. During monitored visits, the social worker observed that the girls were comfortable with father and his fiancée.

The C.'s reported that their ultimate goal was to adopt all four children but, until that time comes, they were willing to take legal guardianship of them and provide them with a loving and stable home.

*Hearing on Father's Motion for Reconsideration*

On October 23, 2013, the juvenile court denied father's motion for reconsideration. In so doing, the juvenile court pointed out that counsel had had an opportunity to present father's position.

*Section 366.26 Hearing* (*Dec. 4 & 5, 2013*)

Following testimony and argument, the juvenile court stated that the focus had shifted from the parents' ability to improve to the children's stability. Guardianship did not preclude parental involvement and visitation. Long-term foster care was the most uncertain and unstable placement. The children had improved in the C.'s home, and their improvement was a strong indication of the children's best interests.

Ultimately, the juvenile court found that the children were adoptable, but section 366.26, subdivision (c)(1)(B)(iv) applied because the C.'s wanted legal guardianship. The juvenile court further found legal guardianship to be in the children's best interests and granted guardianship to the C.'s. It ordered monitored visits for father[4] and telephone calls three times a week.

---

[4] The children's counsel stated that while they enjoyed contact with father, they did not want unmonitored visits.

*Appeal*

Father's timely appeal ensued.

## DISCUSSION

I. *Father's Request for a Continuance*

Father asserts that the denial of his request for a continuance of the hearing on his section 388 petition was an abuse of discretion. He also contends that the juvenile court committed additional err by refusing to grant reconsideration of the denial of that request.

A. <u>The Law</u>

The juvenile dependency system requires that petitions brought under section 300 be heard and decided rapidly. (*Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1241.) By mandating accelerated proceedings, the dependency system "seeks to keep to a minimum the amount of potential detriment to a minor resulting from court delay. [Citation.]" (*Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 193.) "'[D]elay disserves the interests of the minor, the parents, and the courts, and is clearly inconsistent with the intent of the Legislature.' [Citation.]" (*Ibid.*) Continuances in dependency cases are therefore discouraged and "should be difficult to obtain." (*Jeff M. v. Superior Court*, *supra*, at p. 1242.) A juvenile court's denial of a request for a continuance will not be overturned on appeal absent a showing of an abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180; *In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811.) "Discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice. [Citation.]" (*In re Karla C.*, *supra*, at p. 180.)

Section 352 is the primary statute governing continuances in dependency proceedings. (*Renee S. v. Superior Court*, *supra*, 76 Cal.App.4th at p. 194; see also Cal. Rules of Court, rule 5.550(a).) It provides that a juvenile court may grant a continuance, but "only upon a showing of good cause" and "only for that period of time shown to be necessary by the evidence presented at the hearing." (§ 352, subd. (a).) Moreover, no continuance may be granted "'that is contrary to the interest of the minor.'" (*Renee S. v. Superior Court*, *supra*, at p. 194.) In considering the minor's interests, the court must

"give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid.*) The policy articulated in section 352 has been interpreted as "an express discouragement of continuances. [Citations.]" (*In re Karla C.*, *supra*, 113 Cal.App.4th at pp. 179–180.)

"In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a).)

B. <u>No Error</u>

In this case, we find no abuse of discretion in the denial of father's request for a continuance. Father was present in court on August 15, 2013. At that time, the juvenile court, "with great regret," found that it had to continue the hearing on father's section 388 petition to October 4, 2013. Father was ordered to return to court on that date, without further notice. However, father chose not to appear.

At the hearing on October 4, 2013, father's counsel informed the juvenile court that father was not present and that counsel's office had tried to reach him but was only able to leave a voicemail message. Father's counsel went on to state that father had intended to seek a continuance because "an essential witness" (father's fiancée) was unavailable that date. The juvenile court denied father's request, noting that the matter had already been continued a long time.

Although counsel's remarks indicate that she knew prior to the hearing that father intended to seek a continuance, she failed to provide an explanation for the failure to file a motion for a continuance at least two days prior to the hearing. (§ 352, subd. (a).) Counsel thus showed no cause, much less good cause, to present an oral motion for a continuance on the ground that other witnesses were unavailable.

Moreover, counsel did not argue that father's testimony was necessary for his section 388 petition. He also did not inform the juvenile court of the proposed content of father's testimony. Counsel's indication as to what father would have said was too late;

16

those comments were made after the juvenile court denied father's request for a continuance. And, as the juvenile court noted, father failed to provide documentary evidence of his sobriety and psychological progress, evidence that he could not fully provide through his testimony.

Granting a continuance would have been contrary to the children's interests. The section 366.26 hearing was originally set for January 29, 2013. Eight months later, on October 4, 2013, father's section 388 petition was the only impediment to proceeding with that hearing. Father claims that the children's uncertainty was not important because they were not going to be adopted. But, the evidence shows that while the section 366.26 hearing was pending, the girls remained in a state of uncertainty regarding their placement. They expressed worry about being forced to go live with father—the thought made them upset and gave Destinee stomachaches. They wanted to stay with the C.'s. Their wraparound team noted that the girls needed to continue services until Destinee was settled with a permanent plan; the team also noted that the children had a hard time before and after court hearings. It was in their best interests to bow to their needs to for stability by quickly determining these issues.

Father further argues that because he had appeared at "most" of the other hearings, the juvenile court should have realized that his absence was an anomaly. Father is mistaken. He missed the majority of the hearings in these proceedings. Most tellingly, father did not appear at the recent hearings (Mar. 29, 2013, and Apr. 18, 2013), which addressed his first section 388 petition. His first section 388 petition was denied on the latter date, and father never complained that this was done in his absence.

Finally, father's reliance on *In re Hunter W.* (2011) 200 Cal.App.4th 1454 is misplaced. In that case, the parents appeared in court on the date of the hearing at the morning calendar call. They then left, as the father's counsel had asked him to get a signed letter from a service provider and return in time for the afternoon calendar. Counsel had thought that another trial would proceed in the morning. The parents were not present when the juvenile court called the case at 10:20 a.m. Counsel requested a continuance until later the same day, which the juvenile court denied. (*Id*. at pp. 1460–

1461.)  The Court of Appeal found that the requested delay of a few hours was not significant enough to constitute a "continuance," and that therefore the standards of section 352 did not apply.  (*In re Hunter W., supra,* at p. 1464.)  Had section 352 applied, there was no evidence that a two-hour delay would have affected the child's interest in the prompt resolution of his custody status.  (*In re Hunter W.*, *supra*, at p. 1465.)

In contrast here, father did not appear at all on October 4, 2013.  His counsel could not reach him, and he could not have appeared later that same day.  The evidence showed that the children suffered from the uncertainty of their placement, necessitating a prompt resolution of their custody status.

C.  Any Error Would Have Been Harmless

Even if the juvenile court erred in denying father's request for a continuance, any error would have been harmless.  (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1122.)  Ample evidence supports the juvenile court's decision, which was based upon factors that father's testimony would not have changed.

As the juvenile court noted, most of the evidence that father presented to show that he had complied with the case plan predated father's previous section 388 petition, which had been denied.  Father did not appeal that order and thus it is final.  DCFS and the children had already pointed out, in separate filings and at the hearing, many remaining defects and concerns based on father's evidence.  The juvenile court indicated that it had no intention of questioning its prior decision that that evidence was insufficient to support the changes father sought.  Rather, the juvenile court stated that its concerns mirrored those expressed by the children's counsel and by DCFS.

Moreover, as set forth above, father had offered "no documentary evidence of any further compliance by father since the last 388" and he still did not have "a current psychiatric or psychological evaluation since the last 388."

Certainly father's testimony could have addressed his continued participation in counseling or AA meetings and his perception of his own psychological functioning.  But, such testimony would not have taken the place of a full psychological assessment.  The assessment from a year earlier presented several concerns that placing the children

18

with him would exacerbate his ongoing generalized anxiety disorder and possibly trigger a recurrence of his major depression and/or substance abuse. Indeed, the last time he had custody of the children, he became so stressed with the pressure of caring for them that he neglected their needs and even tried to commit suicide.

Since that time, the children had witnessed serious domestic violence and drug use and had been moved numerous times. Destinee had been diagnosed with mental health issues requiring her to take psychotropic medication. Jaimee had severe behavioral problems that led to her attacking her caregivers (the D.'s) and her siblings, though her issues were deemed to be the result of environmental stresses. Both children expressed that they did not want to move to Maryland, and their service providers indicated that a move would be detrimental to their psychological well-being. The evidence gave every indication that the girls would have a difficult transition if they were moved away from the C.'s, including deteriorating behavior and even violence against family members. Father's psychological evaluator knew nothing about the girls' special needs and still cautioned that father might not be able to handle the addition of two daughters to his life.

In his court filings, father had already presented his own optimistic assessment of his ability to handle the children. Further testimony from him would not have taken the place of a full psychological evaluation to assess whether father had become more stable in the past year.

Father also filed an opposition to the psychotropic medication for Destinee in March 2013, although she had been taking prescribed psychotropic medication for a long time before then. Destinee had been hospitalized for two weeks due to a psychotic episode. Yet father opined that he she did not have serious mental health problems and should not take medication. As for himself, father was proud that he did not take psychotropic medication, as he indicated in his letter to the juvenile court that he submitted with each of his section 388 petitions. However, the psychological evaluator believed that father should be taking medication given his multiple suicide attempts and ongoing mental health issues. And, psychiatric care and consultation for consistent use of psychotropic medication was part of father's court-ordered reunification case plan,

19

with which he never complied.  In short, father did not show that he had a handle on either his children's or his own psychological needs.

Also, as noted above, father's testimony would not have replaced documentary evidence proving father's sobriety and participation in programs.  Father only provided one negative drug and alcohol test, which was dated one year prior to the hearing.  His discharge report from his alcohol program showed that he had had four positive alcohol tests.  Worse, he only had 30 days of sobriety at the time he left the program, as opposed to the usual 90 days to successfully complete the program, as indicated on the preprinted form.  The form also indicated that it was sent to an individual with "Community Supervision," suggesting that father completed the program as a requirement of parole or probation in connection with one of his several alcohol-related offenses.  Though he had shown attendance sheets for many AA meetings in the first half of 2013, and indicated that he intended to continue, he had continued drinking even during his alcohol program, leading to four positive alcohol tests out of 15 over eight months.  He had not expressed any intention to seek out additional substance abuse treatment, and he had not successfully engaged in random alcohol testing.  Mere testimony would not have overcome all of this evidence.

Perhaps most importantly, the juvenile court denied father's petition because it was not in the girls' best interests.  The juvenile court was persuaded by the children's statements about their needs and desires and the "very articulate and thoughtful" brief by the children's counsel that father's requests were not in their best interests.  The juvenile court commented that "after years of instability, [the children had] finally found a stable placement where they [were] thriving."  After all, prior to their placement with the C.'s, the girls had moved numerous times to different homes; they had witnessed domestic violence and drug use; and they had suffered psychological trauma.  They said that they finally felt stable and did not want to have to move.  (They were able to live with their siblings, James and Allison, in the C.'s home.  All of their service providers agreed that the girls had begun the healing process since they had been placed in the C.'s home, and

20

they showed great improvement. To move them at that time would have seriously jeopardized their progress.

Finally, the juvenile court expressly stated that father should file a new section 388 petition when he had further evidence of his progress and suitability. Father did not do so immediately, either with his request for reconsideration or at any time in the two months between the denial of his section 388 petition and the section 366.26 hearing.

D. Reconsideration

Section 385 provides that any order of the juvenile court may be changed, modified, or set aside as the judge deems proper, subject to various procedural requirements.

Here, father's motion for reconsideration of the juvenile court's previous order was based on father's declaration asserting he had inadvertently missed the hearing due to a misunderstanding stemming from difficulties communicating with his counsel's office. At the hearing itself, father's counsel indicated to the juvenile court that there had been some confusion and that she could not reach father. In considering the motion for reconsideration, the juvenile court found that the explanation given in father's moving papers was consistent with the explanation before the juvenile court at the hearing, which the juvenile court had already rejected as good cause for a continuance. Accordingly, father's motion for reconsideration did not present new evidence or a change of circumstances that would have required a change in the order denying a continuance.

And, in any event, for the reasons set forth above, any error in denying the motion for reconsideration of the denial of a continuance would have been harmless.

II. *Legal Guardianship*

Father argues that the evidence failed to support the finding that a permanent plan of legal guardianship was in the best interests of the children.

A. The Law

Section 366.26, subdivision (c)(1), requires the juvenile court to terminate parental rights to an adoptable child unless compelling reasons exist for determining that such termination would be detrimental to the child. One such exception is that the children are

21

at least six years old and are living with a foster parent who is unable or unwilling to adopt, but who is willing to provide, and capable of providing, a stable and permanent environment, and removal would be detrimental to the children's emotional well-being. (§ 366.26, subd. (c)(1)(B)(iv).)  If this exception applies, the statutory scheme mandates that the caretakers or other appropriate persons become the child's legal guardians. (§ 366.26, subd. (c)(4)(A).)  The legislature's order of preference in section 366.26 demonstrates its determination that legal guardianship will most often serve a child's interests better than long-term foster care.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 472 [between the two plans, legal guardianship is the Legislature's stated preference as it provides much more stability for a child than foster care].)

The appeal from an order by the juvenile court appointing a legal guardian is reviewed for an abuse of discretion.  (*In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 803–804.)

### B.  No Error

The juvenile court had ample evidence to find that the C.'s were suitable guardians for the children.  All of the girls' service providers concurred that they had improved substantially in the C.'s home.  They consistently stated that they wanted to remain living with the C.'s.  The C.'s had been significantly involved in their lives for over five years, and the girls had lived with them for the past year.  Over the recent year in the C.'s home, the girls were thriving, happy, and improving in their behavior and mental health.

Although the C.'s had had referrals in the past for using physical discipline and not maintaining their home to a high standard,[5] they had addressed those issues by cleaning and repairing their home and agreeing not to use physical discipline.  When DCFS assessed the home for the most recent placement with the C.'s, the home was found to be clean and safe.  The C.'s took extra classes to learn how to care for children with mental and emotional special needs.  And, the proof of the children's best interest

---

[5]     DCFS determined that the C.'s could not be approved as adoptive parents.  DCFS did not disclose the reasons for that determination, and father speculates as to the reasons why.  Father's speculation is not evidence and does not establish an abuse of discretion.

22

was their dramatic improvement once they were placed with the C.'s. They became calmer and their behavior turned around. The wraparound team and the social workers, who all met with the family on a regular basis, were impressed and agreed that Destinee and Jaimee should remain with the C.'s.

Below, father asserted that the juvenile court should have ordered a plan of long term foster care, rather than legal guardianship, because he wanted the least permanent plan possible, to bolster his anticipated future arguments for custody. However, by the time of the section 366.26 hearing, the focus shifts from the parent's interest to the children's needs for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) In this case, those needs were particularly compelling. Destinee and Jaimee had been moved numerous times in their young lives, between mother and father, between father and foster care homes in Maryland, then to mother in California, then to the C.'s, then to a different California foster home, then back to the C.'s again, then back to mother, then to a different California home, then to the D.'s, and then finally back to the C.'s. These moves, as well as the abuse and neglect they endured in their parents' homes, caused them serious trauma. Over the past year with the C.'s, the children had finally stabilized and their severe negative behavior had abated. They felt safe and comfortable and did not want to move. It follows that their paramount needs were met by the juvenile court's order of legal guardianship.

Last, it is worth noting that the establishment of the guardianship did not diminish father's right to visitation and contact. As before, father was allowed monitored visits whenever he came to California. Also as before, father was allowed telephone visitation three times a week. And, because the juvenile court maintained jurisdiction over the children, father continued to have the opportunity to seek changed orders under section 388. It follows that the juvenile court did not abuse its discretion in ordering a legal guardianship for the children.

III. *Monitored Visitation*

Father argues that the juvenile court abused its discretion in refusing to grant father's request for unmonitored visitation with the girls.

When the juvenile court finds termination of parental rights would be detrimental and orders a plan of legal guardianship, it is required to order visitation between the parents and the children, unless it finds that such visitation would be detrimental to the children. (§ 366.26, subd. (c)(4)(C).) In making an order for visitation, the juvenile court must "balanc[e] . . . the interests of the parent in visitation with the best interests of the child," an may "impose . . . conditions . . . in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child." (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.)

Visitation orders are reviewed for abuse of discretion. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704–1705.)

Here, the children stated that they felt more comfortable having monitored visits with father, and the juvenile court could rightly take into account their stated desires not to have unmonitored visits with father. After all, they had had limited visits with father over the past five years. And, father had upset the girls before during monitored visits by discussing their moving to his home in Maryland, threatening their emotional stability. Father had also posted misleading diatribes about the case on public Web sites, using the girls' full names, leading to legitimate questions about father's judgment as to the children.

Although father was often appropriate with the girls, and they exhibited a good relationship with him, there were enough concerns, and the girls' emotional health was fragile enough, to warrant continued monitored visitation. According, the juvenile court did not abuse its discretion.

**DISPOSITION**

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
BOREN


_____, J.
CHAVEZ


25